UNITED STATES of America, Plaintiff,

v.

ROCKFORD MEMORIAL CORPORATION and SwedishAmerican Corporation, Defendants.

No. 88 C 20186.

United States District Court, N.D. Illinois, W.D.

Feb. 23, 1989.

Richard S. Martin, Seymour H. Dussman, Nancy M. Goodman and Fred E. Haynes, Antitrust Div., Dept. of Justice, Washington, D.C., for plaintiff.

Gardner, Carton & Douglas, Chicago, Ill., Holmstrom & Green, and Williams & McCarthy, Rockford, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## MEMORANDUM OPINION AND ORDER

ROSZKOWSKI, District Judge.

## NATURE OF THE CASE

On September 27, 1987, the defendants Rockford Memorial Corporation ("RMC") and SwedishAmerican Corporation ("SAC") executed a Memorandum of Understanding agreeing, in principle, to form a new corporation which would become the sole member of and control RMC and SAC and all their affiliate corporations including their respective principal subsidiaries, Rockford Memorial Hospital ("RMH") and Swedish-American Hospital ("SAH"). The consolidation was originally scheduled to take place June 1, 1988. On June 1, 1988, the United States of America ("government") filed a verified complaint, to prevent and restrain the merger of RMC and SAH and to adjudge the transaction to be in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1. The government also moved for a preliminary injunction to enjoin RMC and SAC from taking any action to proceed with the consolidation.

Subsequent to the hearing on the government's motion for a preliminary injunction, the defendants agreed to voluntarily refrain from proceeding with the consolidation until a ruling on the motion for a preliminary injunction. Beginning on June 20, 1988 and concluding on July 14, 1988 the court heard the parties on the government's motion for a preliminary injunction. Subsequently, the parties have stipulated to a consolidation of the preliminary injunction hearing with a trial on the merits. The defendants have also moved to dismiss the government's Section 7 Clayton Act claim.

## APPLICABILITY OF SECTION 7 OF THE CLAYTON ACT

■ As a preliminary matter, the court must decide if section 7 of the Clayton Act, 15 U.S.C. § 18, applies to the parties and transaction in question. The defendants have moved this court to dismiss the government's Section 7 claim for lack of subject matter jurisdiction. In essence, the defendants contend that Section 7 does not reach a non-stock consolidation between

not-for-profit hospitals.[1]

The government disputes the defendants' conclusion and points to the United States Supreme Court's decision in *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), to support their contention that Section 7 does indeed apply to the instant transaction. The defendants, on the other hand, do not view the *Philadelphia* decision as dispositive on the issue of Section 7 applicability and instead primarily rely on a reading of the language in Section 7, itself.

Section 7 of the Clayton Act states as follows:

> No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition or to tend to create a monopoly.

15 U.S.C. § 18.

At the risk of oversimplifying their position, the defendants read the first part of Section 7 as being made up of two provisions—the first provision referring to an acquisition of "stock" or "share capital" and the second provision referring to an acquisition of "assets." This first provision, according to the defendants, applies to all "persons" whether or not they are under the Federal Trade Commission's ("FTC") jurisdiction, while the second "asset acquisition" provision applies only to persons under the jurisdiction of the FTC.

The defendants contend that the first provision applies only to consolidations accomplished through an acquisition of stock or share capital. Furthermore, the defendants argue that this first provision is dispositive in the instant case since the second provision only applies to persons under the FTC's jurisdiction, and not-for-profit companies such as the defendants in this case, are not under the aegis of the FTC. Accordingly, the defendants reason that since the consolidation of Rockford Memorial Corporation and SwedishAmerican Corporation does not involve a transfer of stock or share capital, and neither entity is under the FTC's jurisdiction, the transaction here is not reached by either the first or second provision of Section 7 and hence the Section is inapplicable to the defendants' consolidation.

The defendants continue that such an interpretation is not unreasonable even after a reading of the *Philadelphia National Bank* decision. The government contends that the case law in *Philadelphia* and subsequent decisions does not support the defendants' position.

In *Philadelphia National Bank, supra,* two banks, not under the jurisdiction of the FTC, intended to consolidate in a manner that had not been traditionally reached by the pre–1950 amended "stock" or "share" acquisition provision in Section 7. Thus, the *Philadelphia* court embarked on an analysis of the post–1950 amended section 7 and its applicability to a merger of two entities outside the FTC's jurisdiction. *Philadelphia*, 374 U.S. at 337, 83 S.Ct. at 1727.

The *Philadelphia* Court reviewed the history of Section 7 from the time of its enactment to the Supreme Court's decisions which effectively rendered it useless on all manner of mergers and consolidations.[2] The Court then proceeded to review

---

**1.** Neither party disputes that the defendants are "not-for-profit" corporations and that the consolidations will not involve a transfer of stock.

**2.** "[T]he courts found mergers to be beyond the reach of § 7 even when the merger technique had supplanted stock acquisitions as the prevelant mode of corporate amalgamation. [cita-

tion omitted]; *see Thatcher Mfg. Co. v. Federal Trade Commission* and *Swift & Co. v. Federal Trade Commission* decided together with *Federal Trade Commission v. Western Meat Co.*, 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405; *Arrow–Hart & Hegeman Electric Co. v. Federal Trade Commission*, 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed.

the effect of the 1950 amendment that added the "asset acquisition" provision.[3] Based on this review, the *Philadelphia* Court concluded that through the 1950 amendment "[c]ongress primarily sought to bring mergers within § 7 and thereby close what it regarded as a loophole in the section." *Philadelphia*, 374 U.S. at 341, 83 S.Ct. at 1729. The Court continued that not only was Section 7 amended to reach mergers but, in some cases, also transactions which simply involve a purchase of assets unaccompanied by an exchange of shares or alteration of corporate identity. *Philadelphia*, 374 U.S. at 341–42, n. 20, 83 S.Ct. at 1729–30, n. 20.

After determining the intent of the amendment, the Court explained how this intent was carried out through the insertion of the "asset acquisition" provision. The Court noted that in order to bring the "entire range of corporate amalgamations from pure stock acquisitions to pure assets acquisitions, within the scope of § 7, the stock acquisition and asset acquisition provisions must be read together in order to reach mergers, which fit neither category perfectly but lie somewhere between the two ends of the spectrum." *Philadelphia*, 374 U.S. at 342, 83 S.Ct. at 1730. This interplay between the "asset acquisition" provision and the "stock acquisition" provision expands the meaning of § 7 in general and, importantly for our purposes, the "stock acquisition" provision in particular, to include acquisitions by merger or consolidation. *Philadelphia*, 374 U.S. at 346, 83 S.Ct. at 1732.

Besides providing the interplay with the "stock acquisition" provision, Congress also intended the "asset acquisition" provision to cover pure asset acquisitions such as the type of transaction found in the

*Columbia Steel* case which involved a cash purchase by United States Steel Corporation of the physical assets of Consolidated Steel. There was no exchange of shares and no alteration of Consolidated's corporate identity. *Philadelphia*, 374 U.S. at 341–42, n. 20, 83 S.Ct. at 1720–30, n. 20; *See also United States v. Columbia Steel Co.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). Of course, Section 7 qualifies its reach of simple asset acquisitions to "person[s] subject to the jurisdiction of the Federal Trade Commission." 15 U.S.C. § 18. "So construed, the specific exception for acquiring corporations not subject to the FTC's jurisdiction excludes from the coverage of § 7 *only* asset acquisitions by such corporations *when not accomplished by merger.*" 374 U.S. at 343–44, 83 S.Ct. at 1730 (emphasis added).

In sum, the only difference in the reach of amended § 7 with regard to persons under, or not under, FTC jurisdiction is that Section 7 does not reach non-merger asset acquisitions accomplished by persons not under the FTC's jurisdiction.[4] What is covered by amended § 7 for all "persons" is the entire amalgamation of corporate mergers, from pure stock acquisitions to everything up to, but not including, a pure asset acquisition not accomplished by merger. *Philadelphia*, 374 U.S. at 383–44, 83 S.Ct. at 1730–31.

The *Philadelphia* Court's interpretation of § 7 essentially refutes the defendants' argument that the "first provision" of § 7 only reaches consolidations accomplished through an acquisition of "stock" or "share capital." Aware that the court may interpret the *Philadelphia* case to hold that corporate mergers accomplished by persons outside the FTC jurisdiction are sub-

1007"; *Philadelphia*, 374 U.S. at 339, 83 S.Ct. at 1728.

**3.** The original § 7 read in pertinent part: "no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such com-

merce in any section or community, or tend to create a monopoly of any line of commerce."

**4.** The *Philadelphia* Court explains that Congress felt that pure asset acquisitions by persons not under FTC jurisdiction were less significant for anti-trust purposes, as the accretion of assets in these circumstances does not necessarily correspond to greater economic power. *See Philadelphia*, 374 U.S. at 344 n. 22, 83 S.Ct. at 1731 n. 22.

ject to § 7, the defendants attempt to limit the reach of the *Philadelphia* Court's decision.

First, the defendants assert that the *Philadelphia* decision only applies to bank mergers, presumably since that is the type of merger involved in the case. The defendants cite several references to the terms "bank merger" in the text of the decision as proof of the exclusivity of the decision. Even a cursory review of that portion of the *Philadelphia* Court's opinion relevant to the defendants' motion to dismiss, however, evidences the broad scope of the Court's decision.

The relevant discussion is entitled "III. The Applicability of Section 7 of the Clayton Act to Bank Mergers; A. The Original Section and the 1950 Amendment." While this headline directly refers to "Bank Mergers," it in no way limits the breadth of the discussion that follows to bank mergers. Indeed, for purposes of the Court's analysis of § 7 as amended, the fact the defendants were banks was little more than fortuity. Of primary importance for purposes of the discussion was the defendants' status as a "person not under the jurisdiction of the FTC." This fact is confirmed over and over again in the text of the section.

For example, in summing up the question before it as one of first impression, the Court explains that there is no previous case in which a merger or consolidation was challenged under § 7 of the Clayton Act as amended, when the acquiring corporation was not subject to FTC jurisdiction. *See, Philadelphia,* 374 U.S. at 337, 83 S.Ct. at 1727. Then, after analyzing § 7 and the 1950 amendment, the Court held that "the specific exception for *acquiring corporations* [not merely banks] *not subject to the FTC's jurisdiction* excludes from the coverage of § 7 only assets acquisitions by such corporations when not accomplished by merger." 374 U.S. at 342, 83 S.Ct. at 1730 (emphasis added). Further, the Court did not limit to banks the following findings: "It is unquestioned that the stock-acquisition provision of § 7 embraces *every corporation* engaged in commerce, includ-

ing banks." 374 U.S. at 343, 83 S.Ct. at 1730 (emphasis added). "If, therefore, mergers in other *industries* outside the FTC's jurisdiction were deemed beyond the reach of § 7, the result would be precisely that difference in treatment which Congress rejected." 374 U.S. at 333–34, 83 S.Ct. at 1730–31. Finally, the Court explicitly acknowledges that "[w]e have not overlooked the fact that there are corporations in other industries not subject to FTC's jurisdiction." *Philadelphia,* 374 U.S. at 344 n. 22, 83 S.Ct. at 1731 n. 22. These references and others belie any argument that only mergers between banks were being considered in section III–A of the *Philadelphia* Court's decision.

Second, the defendants argue that the *Philadelphia* Court's analysis specifically focused on a transaction that involves exchanges of stock for stock. Thus, the defendants contend the *Philadelphia* Court did not intend by its holding to cover mergers between corporations which do not issue stock and are not subject to FTC jurisdiction. The defendants cling to an argument analogous to the argument of the defendants in the *Philadelphia* case itself; namely, that there is a distinction between an acquisition of corporate control through the exchanging of stock and an acquisition of corporate control in another manner [i.e. through agreement]. The Congress and the *Philadelphia* Court, however, specifically rejected this distinction and the unwarranted importance placed on the role of stock in acquiring control of a corporation. *See e.g. Philadelphia,* 374 U.S. at 343, 83 S.Ct. at 1730.

Indeed, in *United States v. Chelsea Savings Bank,* 300 F.Supp. 721 (D.Conn.1969), the court found the merger of two non-stock banks to be subject to Section 7 of the Clayton Act. The *Chelsea* court, relying almost entirely on the Supreme Court's decision in *Philadelphia,* found no reason to support a ruling limiting the Supreme Court's rationale to amalgamations involving stock. *Chelsea,* 300 F.Supp. at 725. Instead, the *Chelsea* court interpreted the *Philadelphia* decision as a rejection of form over substance.

There is little question that the Supreme Court was primarily concerned with the substantive effect of a merger in consolidating the economic power of two corporations, rather than with the procedure through which the consolidation of power was effected.

*Chelsea*, 300 F.Supp. at 723.

The *Chelsea* court then analyzed the non-stock consolidation of the two non-stock mutual banks and, based on this analysis, found that their consolidation was "tantamount in its effects to a merger" and thus should be tested by the standards set forth in § 7. *Chelsea*, 300 F.Supp. at 723–24, *see Philadelphia*, 374 U.S. at 344 n. 22, 83 S.Ct. at 1731 n. 22.

The defendants counter that *Chelsea* does not stand for the proposition that mergers effected without the exchanging of stock are subject to § 7, since the *Chelsea* court found that the depositors of a non-stock mutual savings bank stand in the same relation to the bank as the stockholders of an ordinary bank. Thus the depositors interest in a non-stock mutual savings bank is "share capital" under the provisions of § 7 of the Clayton Act.

The defendants miss the point. First, the *Chelsea* court had already found that the consolidation was subject to § 7 before it considered the "little practical significance" between the interests of bank shareholders and non-stock mutual bank depositers. *Chelsea*, 300 F.Supp. at 723–24. Second, and more importantly, *Chelsea* demonstrates the foolishness of requiring an exchange of stock to trigger § 7 of the Clayton Act. The *Chelsea* court's finding that ownership in a non-stock bank is similar to a stock bank's strengthens, rather than weakens, the argument that the ethereal manifestations of ownership are unimportant for anti-trust purposes. Indeed, there is "little practical significance" to a consumer if a combination of economic power which may lessen competition occurs through an exchange of stock or an agreement to merge. Consumers, not depositors and stockholders, are the class of persons to be protected by § 7. The method and manner of acquiring or exchanging owner-ship in an entity is not the inquiry that should be emphasized; rather, the inquiry is whether the resulting corporation(s) owns or controls, however that is manifested, the economic power of the prior corporations. *See United States v. Columbia Pictures*, 189 F.Supp. 153, 182 (S.D.N.Y. 1960) (found that Section 7 "is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse 'effect' ").

Any other construction of § 7 or the Supreme Court's decision in *Philadelphia* leaves open a loophole for clever companies to exploit. Over and over again, the *Philadelphia* Court points out that the amended language in § 7 was intended to ensure against such blunting of the anti-merger thrust of the section by evasive actions. *Philadelphia*, 374 U.S. at 346, 83 S.Ct. at 1732. Indeed, the *Philadelphia* Court found that even a pure "assets acquisition" consummated by a person not under FTC jurisdiction would be subject to § 7 "if such an exchange ... were tantamount ... to a merger." *Philadelphia*, 374 U.S. at 344 n. 22, 83 S.Ct. at 1731 n. 22; *see also United States v. Archer Daniels Midland Co.*, 584 F.Supp. 1134, 1139 (S.D.Iowa 1984) (held that lease of operations of one firm by another was an "acquisition" within the purview of Section 7 since to hold otherwise would permit the adroit use of leases to frustrate the anti-competitive purposes of the Clayton Act).

The bottom line to the *Philadelphia* decision is that Congress amended § 7 in order to reach mergers *without qualification*. The *Philadelphia* and *Chelsea* decisions teach that distinctions between methods of merging are meaningless for purposes of § 7. That lesson has not been lost on this court and it will not recognize cosmetic distinctions between mergers, including the existence of a stock transfer or the lack thereof.

Finally, the defendants attempt to limit the reach of the *Philadelphia* decision by pointing to the "Anti–Trust Improvement

Act of 1980." In that Act, Congress amended certain language in Section 7 of the Clayton Act in order to ensure that the FTC's jurisdiction, as evidenced in § 5 of the FTC Act, is "co-extensive" with the reach of § 7. The defendants imply that if Congress intended to broaden § 7's coverage even further by removing the exception for persons not subject to FTC jurisdiction, it could have done so in the Act, but it did not. Therefore, the defendants contend, this non-action evidences Congress' intent to keep persons not subject to the FTC from invoking § 7 of the Clayton Act.

The court finds the defendants' argument irrelevant for several reasons. First, the FTC's jurisdiction is not at issue and hence neither is its "co-extensiveness" with § 7's jurisdiction. All parties agree that the FTC has no jurisdiction over the defendants. Next, the fact that Congress did not want to eliminate the "asset acquisition" exception for persons not under the FTC jurisdiction may be because there already existed the ability to challenge mergers by not-for-profit corporations and thus no broadening was needed. Finally, and most importantly, the actions or non-actions of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one. *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960). What Congress intended in 1950 by amending § 7 of the Clayton Act may not be revealed by congressional action in 1980. Accordingly, the defendants have failed to persuade the court to preclude the application of the *Philadelphia* court's interpretation of § 7 to the transaction at bar.

The question that remains, therefore, is whether the transaction at issue is a consolidation or merger within the entire amalgamation of corporate mergers. Given the wide range of corporate mergers, a simpler inquiry may be to determine what the transaction is not—namely, a pure asset acquisition.

The *Philadelphia* court distinguishes a pure sale of assets from a typical merger in the following footnote:

A merger necessarily involves the complete disappearance of one of the merging corporations. A sale of assets, on the other hand, may involve no more than a substitution of cash for some part of the selling company's properties, with no change in corporate structure and no change in stockholder interests. Shareholders of merging corporations surrender their interest in those corporations in exchange for their very different rights in the resulting corporation. In an asset acquisition, however, the shareholders of the selling corporation obtain no interest in the purchasing corporation and retain no interest in the assets transferred. In a merger, unlike an asset acquisition, the resulting firm automatically acquires all the rights, powers, franchises, liabilities, and fiduciary rights and obligations of the merging firms. In a merger, but not in an asset acquisition, there is the likelihood of a continuity of management and other personnel. Finally, a merger, like a stock acquisition, necessarily involves the acquisition by one corporation of an immediate voice in the management of the business of another corporation; no voice in the decisions of another corporation is acquired by purchase of some part of its assets.

*Philadelphia*, 374 U.S. at 336 n. 13, 83 S.Ct. at 1727 n. 13.

To this end, the government points out that the defendants have never averred that the consolidation of Rockford Memorial Hospital and SwedishAmerican Hospital is an acquisition of assets. Rather, this transaction was characterized by the defendants, themselves, as follows:

The consolidation will be a union of equals, with a board of directors comprised of an equal number of representatives from RMC [Rockford Memorial Corporation] and SAC [SwedishAmerican Corporation]. The board will guide the integration and consolidation of the programs, services and management and governance structure of RMC and SAC and their affiliates.

(Defendants' Motion to Dismiss, p. 6)

Rockford Memorial and SwedishAmerican agreeing ... to form a new not-for-profit corporation which would become

the sole member of and control Rockford Memorial and SwedishAmerican ...

(Defendants' Finding of Facts, ¶ 1)

Based on the merger and sale of assets examples supplied by the *Philadelphia* court, the consolidation outlined above is clearly a merger, not a pure asset acquisition. The two existing corporations are subsumed into a new resulting entity. The resulting corporation inherits the program, services, management, rights, liabilities, obligations and abilities of SwedishAmerican Corporation and Rockford Memorial Corporation. There will be continuity in management and personnel after the consolidation, since representation of both corporations will oversee the new resulting corporation. In short, no empty purchase or sale of assets has occurred in the instant case. Instead, what we have is the combining of the economic power of SwedishAmerican Corporation and Rockford Memorial Corporation. Accordingly, the consolidation proposed by the defendants, as evidenced by their Amended Memorandum of Understanding, is a merger subject to § 7 of the Clayton Act.[5]

Accordingly, the court finds that § 7 of the Clayton Act reaches non-stock mergers accomplished by persons not under the jurisdiction of the FTC. Thus, the court finds that the consolidation of SwedishAmerican Corporation and Rockford Memorial Corporation is subject to § 7 of the Clayton Act.

### PRODUCT MARKET[6]

An analysis of an alleged Section 7 violation requires a determination of the relevant "line of commerce", or product market, in which competition is to be allegedly lessened. The Supreme Court's decision in *Brown Shoe v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) is instructive on how to define a relevant product market or in the provision of healthcare services, service market:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market well-defined submarkets may exist which, in themselves, constitute product markets for anti-trust purposes [citations omitted].

> The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition *"in any line of commerce"* (emphasis supplied) it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition [in this submarket].

*Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1523–24.

---

**5.** As a consequence of the court's finding subject matter jurisdiction regarding § 7 of the Clayton Act, the government's motion to strike the third and fourth affirmative defenses and the defendants' third and fourth affirmative defenses are now moot. The third affirmative defense states that "[t]he bringing of this action under § 7 of the Clayton Act violates Fed.Civ.P. 11" and the fourth affirmative defense states "[b]ecause there is no jurisdiction to bring this action under § 7 of the Clayton Act, it is an abuse of prosecutorial discretion to challenge the consolidation transaction under § 1 of the Sherman Act." The court has, of course, rejected the underlying premise of the defendants' third and fourth affirmative defenses by finding that § 7 of the Clayton Act does apply to the consolidation of Rockford Memorial Corporation and SwedishAmerican Corporation. Accordingly, these defenses are now moot rendering any motion to strike them superfluous.

**6.** The court will employ the following definitions:
- "W" Winnebago County.
- "B" Boone County.
- "O" Ogle County.
- "R" Rock County.
- "S" Stephenson County.
- "L" Lee County.
- "Mc" McHenry County.
- "D" DeKalb County.
- "FF" The court's findings of fact.
- "Tr." Citation to a hearing transcript.
- "GX" Government exhibit.
- "DX" Defendants' exhibit.

■ The purpose of defining a market based on a product's interchangeability with respect to other products is to distill the product market into a product or group of products sufficiently distinct that buyers could not defeat an attempted exercise of market power on the part of the sellers of these products by shifting purchases to different products. If products within the "line of commerce" can be replaced by products from without the market, the product market is too narrow. At the same time, if relevant products in the proposed product market do not share sufficiently peculiar characteristics to allow free substitution among themselves, the product market is too expansive. *See United States v. E.I. Dupont de Nemours & Co.*, 353 U.S. 586, 593–94, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957).

In sum, the service market in which the impact of a merger is measured should include services with sufficiently peculiar characteristics and uses to constitute them products sufficiently distinct from all others.

■ In the case at bar, the government proposes that inpatient care is the relevant product market to be examined, while the defendants proffer a broader product market that includes both inpatient and outpatient care provided by all health care providers.

In support of their market, the defendants point to the trend in health care toward outpatient services. Many procedures once in the exclusive domain of inpatient care, are now performed on an outpatient basis. A boom in medical technology has revolutionized diagnostic testing through the use of computer tomography scans ("CT"), Magnetic Resonance Imagery ("MRI") and surgical procedures through the use of non-invasive techniques such as extracorporeal shockwave lithotriphy ("ESWL") and laser surgery. The defendants point out that scores of tests and treatments are now being performed on either an inpatient or outpatient basis. (FF, ¶ 40–43).

The decision on which type of care to seek, the defendants continue, is in the hands and the discretion of the patient and his or her physician. Further, the defendants reason that third party payers are very price sensitive entities that will choose outpatient care over the relatively more expensive inpatient alternative. The defendants conclude that a product market excluding outpatient services is too narrow; outpatient services are (and will be even to a greater extent in the future) adequate substitutes for inpatient care. Any attempted effort of the merging hospitals to exercise market power by raising inpatient prices would be counteracted by the shifting of patients from inpatient to outpatient care.

The court agrees that there is interchangeability between outpatient and inpatient services. The court, however, does not agree that the relevant line of commerce includes outpatient care. While the court acknowledges that there is a substitutability between inpatient and outpatient care, this substitutability is over time and therefore not dispositive for purposes of defining the product market. (Tr. 1634). What is meant by "substitutability over time" is simple. Over time, some exclusively inpatient tests and procedures are performed on an outpatient basis through the implementation of new technology and medical knowledge. Once it is established, however, that a test or procedure may be performed on either an inpatient or outpatient basis, other forces come into play negating free substitutability between inpatient and outpatient care.

In particular, the "cost containment" efforts of third party payers, such as "pre-admission screening" and "current and post-discharge utilization review," affect the "alternatives" available to a physician and hence his or her patient. These and other "cost containment" procedures compel the patient to utilize the lowest cost-effective treatment available. If either an inpatient or outpatient treatment can be used, the physician and patient must choose the invariably less expensive outpatient procedure to insure reimbursement by a third party payer. Thus, the end result of "pre-admission" screening and similar cost con-

tainment efforts is that usually only patients who are too "sick" to receive outpatient care [or where no comparable outpatient treatment is available] receive inpatient care. Thus, to a great extent, patients now receiving inpatient care could not have received outpatient care as a substitute. Why this phenomena occurs leads us to the peculiar characteristic of inpatient vis-a-vis outpatient care. (*See* FF, ¶ 44–55).

As mentioned above, patients who need inpatient care in a general acute care hospital are generally more gravely ill than their outpatient counterparts. Their therapy may require several types of diagnostic tests, twenty-four hour nursing, extensive pre or post operative observation, or any number or combination of other services offered by an acute care hospital. (FF, ¶ 56–57).

At the core of these peculiar characteristics is the hospital's ability to provide overnight care—no outpatient program can match this trait. In tandem with overnight care, the hospital has assembled a variety of services "under one roof." This ability to perform a variety of tests and procedures in one place is also unmatched by a non-hospital health provider. While the hospitals may claim that outpatient care providers have raided the hospital's more lucrative services, this does not mean the outpatient providers can provide all the same services. The reason is that no outpatient provider possesses the combination of services at the disposal of a hospital. This concept that a combination or "cluster" of products or services could serve as a relevant product market was adopted in *United States v. Philadelphia National Bank, supra.*

In *Philadelphia,* the "cluster" of services known as "commercial banking" had no real substitute, even in light of the existence of a variety of other types of financial institutions. In *U.S. v. Connecticut National Bank,* 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974), despite finding a good deal of competitive overlap between commercial and savings banks, the Court still found that commercial banks were part of a distinct line of commerce since

they offered a cluster of services that savings banks could not match, particularly with regard to commercial customers. *Connecticut,* 418 U.S. at 663–666, 94 S.Ct. at 2793–95. This "cluster of services" concept was also applied to the health care industry and acute care hospitals, in particular, by the Federal Trade Commission in *In the Matter of Hospital Corporation of America,* 106 F.T.C. 361 (1985), *aff'd, HCA v. FTC,* 807 F.2d 1381 (7th Cir.1986).

In the FTC's decision, the FTC found that the "healthcare" market encompassed such a variety of services offered by providers that it did not reflect the area within which specific health care providers compete. On the other hand, analyzing the individual services offered by providers was also unacceptable, since services were often offered in combination. Thus, the FTC decided that in such cases a "cluster of services", with enough peculiar characteristics such that other services or even combination of services, would not readily interchange with them, would suffice as a service market. *In re HCA,* 106 F.T.C. at 434–35, 465–66. The cluster of services adopted by the FTC for acute care hospitals was acute inpatient hospital care. *In re HCA,* 106 F.T.C. at 464–66.

The FTC reasoned that although outpatient providers (doctor's officers, freestanding clinics, urgent care and surgical centers) offer the same services as hospitals, they are offered in a different context. *In re HCA,* 106 F.T.C. at 436, 464–66. Patients in hospitals are more gravely ill, requiring a cluster of general acute inpatient hospital services. *In re HCA,* 106 F.T.C. at 436, 466. Thus, the FTC found that while hospital services may well have outpatient substitutes, the benefit that accrues to the patient is derived from the complimentary cluster of services and that there is no readily available substitute supplier of the benefit that this complementing or combination of services confers on the acute care patient. *In re HCA,* 106 F.T.C. at 436, 466.

Similarly, the court finds in the case at bar that acute inpatient hospital care is the economically significant submarket of the

healthcare industry that should be analyzed for purposes of determining the competitive effect of the defendants' consolidation.

The characteristics of acute inpatient hospital care are unique among healthcare services. It is an inescapable fact that certain patients cannot be treated on merely an outpatient basis. The obvious reason is that the patient requires greater care either in number of depth of services. Today, and in the foreseeble future, this care can only be effected through inpatient hospital care. There is no substitute for this cluster of care. (FF, ¶ 56–57).

The provision of outpatient care by all healthcare providers, including hospitals, is increasing and will continue to do so in the forseeable future. In hospitals, the same facilities and personnel used to provide inpatient care is also used to provide outpatient care. In addition, many outpatients treated by hospitals are ultimately admitted as inpatients. Undoubtedly, there is direct competition between the individual outpatient services provided by hospitals and non-hospitals. (FF, ¶ 58–65). Despite the presence of this strain of competition, outpatient care is no substitute for acute inpatient hospital care. The outpatient provider represents a few procedures at most and cannot provide in any circumstance, an overnight stay. In providing patient care, the hospital may utilize a procedure that competes directly with outpatient providers when used alone for an outpatient. However, all competition and substitutability between the hospital and the outpatient provider ends when that same outpatient procedure is used in tandem with other services to treat an inpatient. The outpatient provider has nothing comparable to offer.[7] (FF, ¶ 66–67).

If the defendants could assert a small but significant and non-transitory price increase in inpatient care, the exercise of market power could not be ameliorated by outpatient care. Of course, there are some

inpatients currently receiving inpatient care that could possibly utilize outpatient care, but not in numbers significant enough to break an exercise of market power in the inpatient care market.

It is true, as the defendants contend, that non-hospital providers such as out-patient clinics, emergency care centers, doctors offices and other providers, offer some of the same services as do acute care hospitals. Furthermore, it is also true that the relevant product market must include all services provided by acute care hospitals and those services offered by non-hospital providers which are an alternative to hospital care. However, only the acute care hospitals can provide the unique combinations of services which an acute care patient must have. Outpatient facilities routinely feed patients to the hospitals inpatient facilities. Those services include both inpatient and outpatient care, both of which are competed for by acute care hospitals. Accordingly, the court finds that the relevant product market consists of that cluster of services offered only by acute care hospitals.

## GEOGRAPHIC MARKET

The next step in analyzing the effects of the defendants' putative consolidation is to determine the "area of effective competition in the known line of commerce—acute hospital inpatient care." The purpose in determining the appropriate geographic market is to identify the relevant competitors who could constrain the merging firms from exercising market power. (Tr. 757). The geographic "market [should be in an] area in which the seller operates, *and to which the purchaser can practicably turn for supplies." Philadelphia,* 374 U.S. at 359, 83 S.Ct. at 1739 *quoting, Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961) (emphasis supplied), (Tr. 757–58). The Supreme Court refined the inquiry as follows:

---

**7.** The relevant product market also does not include the provision of psychiatric, substance abuse, and rehabilitation inpatient services because they provide a different type of care, *i.e.,* they are not good alternatives for patients who

require inpatient hospital services for treatment of an acute condition; nor could those services easily be transformed into services for treating patients needing acute inpatient care.

The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. (citations omitted) This depends upon "the geographic structure of supplier customer relations (citation omitted)." *Philadelphia*, 374 U.S. at 357, 83 S.Ct. at 1738.

Above all, a "pragmatic factual approach" to the delineation of the appropriate geographic market and not a formal legalistic one should be enlisted. The relevant "section of the country" should "correspond to the commercial realities" of the industry and be economically significant. *Brown Shoe*, 370 U.S. at 336–37, 82 S.Ct. at 1530. Of course, the relevant geographical market need not encompass a recognized geopolitical boundary and may be as big as the entire country or as small as a metropolitan area. *Brown Shoe*, 370 U.S. at 337, 82 S.Ct. at 1530.

The relevant geographic areas proposed by the parties represent significantly disparate views of the market in which RMH and SAH operate. The defendants suggest that the appropriate section of the country consists of the following ten counties: Winnebago, Boone, Stephenson, Ogle, Lee, McHenry, DeKalb (all in Illinois) Walworth, Green and Rock (all in Wisconsin). (DX 120). This area has been labeled the "Winnebago area" and contains nineteen acute care hospitals. (DX 119). Conversely, the government proffers a much smaller area consisting of almost all of Winnebago County and the northeast portion of Ogle County. This area has been labeled the "Rockford area" and contains only the three Rockford hospitals. (GX 39).

It is no coincidence that the parties arrived at such distinct markets since their methodologies diverged soon after each recognized the importance of determining the "geographic structure of the supplier/customer relationship." The government attempted to apprehend this structure primarily through extensive interviews with local and not-so-local health providers and health purchasers. The defendants, on the other hand, placed primary reliance on an empirical study of patient origins and destinations in order to determine the geographic structure of supplier/customer relations or in terms used in the healthcare industry provider/purchaser relations. The court will not comment on the appropriateness of either approach in the abstract but only as necessary in examining the specific merits, or lack thereof, in the parties analyses.

*The Government's Market*

The court will first examine the government's proposed geographic market. The government's market is supported by a relatively few simple propositions that, for the most part, are supported by the evidence taken at the preliminary injunction hearing.

Admitting Patterns

The government explains that hospital admissions are determined, for the most part, not by putative inpatients but by their physicians. These physicians will invariably admit patients to hospitals where the physicians have admitting privileges. In turn, physicians seek admitting privileges at hospitals where they anticipate admitting a significant number of their patients. Usually, physicians want to admit patients to institutions that are convenient both to themselves and their patients. Doctors favor hospitals close enough to allow them to conduct their daily practice and still have time to check patients on daily rounds and if need be to respond quickly to an inpatient in need of immediate attention. In this same vein, patients generally desire to be admitted to a hospital near their family and friends and their admitting physician. In sum, physicians and patients generally choose to use relatively close hospitals. (FF, ¶ 68–73).

The government argues that this tendency for convenience in admitting significantly limits the number of competitors in the market. The government points to the fact that of the approximately 450 physicians in the "Rockford area" nearly all of them have admitting privileges, either active or

courtesy,[8] with all three Rockford area hospitals (RMH, SAH and STA) but nowhere else. Thus, if a "Rockford area" physician's patient wanted to stay at a hospital other than RMH, STA or SAH, he or she would need to be referred to a non-Rockford physician to admit him or her. (Tr. 130, 517, 1268–69). The government surmises that these admitting patterns show that doctors in the "Rockford area" are unwilling to admit their regular patients to hospitals outside the "Rockford area," forcing them to travel longer distances to fulfill their duties. The government further concludes that these same doctors will be unwilling to give up the convenience of the nearby Rockford hospitals for others farther away, even in the event of a price increase in inpatient care at the defendants' hospitals.

Similarly, the government points out that another important group, third party payers, also prefer nearby hospitals. These payers are not amenable to purchasing healthcare outside the three Rockford hospitals for "Rockford area" patients. (FF, ¶ 80). Third party payers are employers, Medicare, Medicaid, and healthcare indemnity insurers such as Blue Cross and Aetna. These payers are the true purchasers of healthcare in most instances. In addition, managed health care plans such as Health Maintenance Organizations ("HMO") and Preferred Provider Organizations ("PPO") are involved in purchasing healthcare. A HMO contracts with a group of physicians to perform medical services for plan subscribers at a set pre-paid fee. A PPO is an agreement between a healthprovider such as a hospital or clinic and a purchaser. The agreement usually consists of the provider granting a discount to purchasers in return for the purchaser's promise to send patients to the healthprovider. (FF, ¶ 75–79). Based on the same doctor/patient sentiment for convenience outlined above, these third party payers are wary of attempting to force plan beneficiaries from their local Rockford hospitals to relatively distant hospitals. (FF, ¶ 75–80).

Nearby Community Hospitals

Next, the government surveyed the hospitals in nearby communities that could potentially compete for the defendants' inpatient business. The government sought to forge the image of small community hospitals that provide primary and secondary services and perhaps a few tertiary services, but do not compete in an overall sense with the three Rockford hospitals. The government was generally successful in demonstrating the relatively limited number and scope of services provided by, among others, Beloit Memorial, Freeport Memorial, Highland, St. Joseph, Sycamore, Rochelle Community, Kishwaukee and Harvard Community Memorial Hospital and the lack of staff overlap between the defendants and these same hospitals. (See FF, ¶ 74, 81–119).

The government ran into trouble, however, when it attempted to question the administrative heads of these hospitals on whether they "compete" with the three Rockford hospitals. (STA, SAH and RMH) Dr. Allen, the government's economist, queried the administrators as to the effect of a hypothetical price increase (usually 10 to 20%) in services offer by the three Rockford hospitals. (Tr. 878–79, 885). This approach was not without its difficulties. First, the pricing of the same services between the three Rockford hospitals often differed by more than ten percent, creating doubt as to what was meant by a 10% or 20% price increase in services offered by the Rockford hospitals. (DX 108, 109, Tr. 1152–56). Secondly, Dr. Allen did not employ a set routine in asking the administrators the hypothetical "price question", also creating doubt as to the consistency of the

---

8. Admitting privileges usually come in one of two main varieties, "active" and "courtesy." A physician with either privilege may admit a patient to the hospital extending that particular admitting privilege. The difference between the two privileges is simple—"active" status denotes that the physician is affiliated with the admitting institution and in some cases must meet certain proximity requirements to insure quick response to a call from the hospital; "courtesy" status denotes that the physician, while not associated with the hospital, still may admit patients. (Tr. 47–48, 80–82, 225).

questions and hence the answers. (Tr. 876–77). In any event, the evidence clearly suggests that the aforementioned community hospitals lack size, services, skills and quality comparable to their Rockford counterparts.

Patient Origin and Destination

Stealing a page from the defendants' reliance on patient origin and destination data, the government contended that the patient origin and destination figures bear out the appropriateness of the "Rockford area" geographic market. First, the government points out that approximately 93% of the residents of the "Rockford area" who are hospitalized turn to one of the "Rockford area" hospitals. (Tr. 764, 944). Second, approximately 75% of the patients admitted as inpatients to the "Rockford area" hospitals reside in the "Rockford area." (Tr. 764, 944). While the government may look at these figures as an indication of the viability of the "Rockford area" market, the defendants cite the fact that twenty-five percent of the defendants' inpatients come from outside the "Rockford area" as "quite a bit of leakage" and proof that the government's proposed market is too small.

The theoretical significance of this "leakage" is simple when looked at in the context of a merger. Within the government's market there are no potential competitors other than the three Rockford hospitals. Assuming that the merged entity could exercise market power even in light of the presence of St. Anthony, then the patients inside the "Rockford area" (75%) could not turn to alternative hospitals with sufficient capacity to defeat the market power exercised and would be forced to suffer the consequences of an anti-competitive market. Meanwhile, the twenty-five percent of the defendants' hospitals' inpatients presently immigrating into the market could presumably turn elsewhere for inpatient care. As a consequence, the defendants could theoretically lose up to twenty-five percent of their patients. (Tr. 1124, 1147–1148). Although there are differing views as to the effect of losing these patients on the pricing of the defendants' services to their remaining patients, (see DX 112, GX 74), the more important and underlying question is whether the other hospitals that the immigrating patients turn to can effectively discipline or constrain the merging hospitals by offering a significant segment (25%) of the defendants' inpatient base as alternative. If this is the case, then the Rockford area market is too small.

The government counters that the defendants would not, in fact, lose twenty-five percent of their patients to surrounding community hospitals since they do not provide the type or quality of services offered by the "Rockford area" hospitals. In short, the government contends that these alternative hospitals do not provide a viable alternative to the immigrating patients and will not "win" these patients away from the defendants. This contention is one of the more hotly debated issues in the instant case. The defendants, through three graphic exhibits, have attempted to show that the reason patients travel to the Rockford hospitals is not because comparable services are not available in their home counties, but rather for the more nebulous reason of the perceived quality of bigger and better hospitals in Rockford.

The defendants attempt to show in two different ways that the average case severity of non-Winnebago County residents hospitalized in Rockford is similar to the average case severity of a patient residing in Winnebago County. The purpose behind these graphs (DX91 and DX130) are to illustrate the type of patient immigrating into the "Rockford area." [9] The averages revealed that of the ten counties, all but

9. The case severity in DX 91 and DX 130 are based on Diagnostic Related Groups ("DRG's") (a label used to identify different types of treatment). DRG's have a cost index assigned to each one. The cost index is based on the average amount of hospital costs that are incurred for each DRG. Using the cost index as a proxy for severity of a patient's illness (i.e. the higher the average cost of the DRG, the more expensive the treatment, thus, the more complex the treatment, and finally the more severe the patient's illness), the defendants tabulated the DRG's provided patients residing in the defendants' proposed ten county area. Finally, the tabulated cost index was averaged for each county. (Tr. 1159).

Boone, Rock and Green had higher average "case severity" than Winnebago County residents. The Rock and Green figures were based on only 881 and 25 cases, respectively, or a mere 1.54% of the total number of cases analyzed in the ten county area, rendering the results for Rock and Green Counties suspect since so few cases were observed. (DX 130). The average "case severity" of counties such as Stephenson, DeKalb, McHenry and Lee were quite a bit higher than Winnebago. (DX 91, 130). Ogle County patients also suffered higher "case severity" but not to any great extent. (DX 91, 130). Even conceding that the underlying assumptions made by the defendants are accurate, the conclusions to be drawn are mixed. For most of the ten county area, the patients who immigrate into Winnebago County are, on average, more seriously ill than Winnebago County residents, with Boone County patients the one conspicuous exception.[10]

The defendants utilize a slightly different tack in DX 93. The defendants present information on how many different DRG's were utilized by patients residing in the ten county area (excluding Winnebago County) in Winnebago County and the number of different DRG's available in their respective home counties. The purpose behind this graph was to demonstrate that services comparable to the Winnebago County hospitals are available at the community hospitals in the ten county area. (Tr. 1161). Interestingly, the results consistently highlight the greater number of DRG's available in the Rockford hospitals as opposed to those offered by healthproviders in the other nine counties. (*See* DX 93). Of course, the point made by the defendants is not that all the DRG's available in Rockford hospitals are available in the other 9 counties, but that a majority of them are.[11] (Tr. 1162–64). In fact, the

defendants believe these figures are understated since many DRG's that are available in the other nine counties may not have been utilized during the pendency of the study and thus were not figured into the study. (Tr. 1254). Of course, the same could be said for DRG's available at the Rockford hospitals. Moreover, there are no break downs as to severity within the DRG's offered; thus, there can be no assurance that more severely ill patients in a given DRG still do not travel to Rockford, while less severely ill patients in a given DRG stay closer to home. (Tr. 1257). The defendants figures again yield mixed results. It appears that more severely ill patients do travel to Rockford hospitals but, at the same time, some of the immigrating patients eschew comparable treatment in their home counties and travel to Rockford.

There are other facts and figures that are less equivocal in exposing the composition of the non-Winnebago County residents hospitalized in Rockford hospitals. A figure used in the defendants' exhibit reveals the nature of the immigrating patients. In DX 112, assessing the "[e]ffect on [the] hospital inpatient price necessary to offset loss of non-Winnebago County admissions to Winnebago County hospitals," the defendants rely on the following fact: "For RMH, the proportion of non-Winnebago revenue-exceeds the proportion of non-Winnebago admissions by 36%." Using, as the defendants did in DX 91, and DX 130, the cost of treatment as a proxy for severity, the disproportionate amount of revenue generated by non-Winnebago County patients illustrates that the severity of the non-Winnebago County patients' illnesses treated at the Rockford hospitals are disproportionately greater than the illnesses of Winnebago County patients treated at the Rockford hospitals.

**10.** The defendants also cite a study conducted by Dr. Frank Sloan for St. Anthony on the defendants' geographic area. Using a 20% sampling of 1982 Medpar data and comparing it with Illinois Hospital Association data, Sloan concluded that an average patient traveling into Winnebago County for inpatient care was more severely ill than patients from Winnebago Coun-

ty; but not to an overwhelming extent. (DX 78 at p. 5).

**11.** This fact was also emphasized in DX 130 where the "middle 50%" percentile of case severity per county is presented to show overlap in case severity among the different county residents hospitalized in Rockford Memorial Hospital.

Another revealing fact with regard to immigrating patients is the referral agreements between hospitals in the ten county area and the Rockford hospitals. The evidence at the hearing established that referral agreements are generally struck when one hospital does not provide a service that another hospital may provide. Usually the services in question involve tertiary care and the corresponding expenses and skill that often prohibits smaller primary and secondary care community hospitals from providing such tertiary services. In a referral agreement, a smaller hospital will agree to "refer" a patient requiring specialized care to a hospital that can provide such care. For example, Freeport Memorial would refer a burn patient to the burn unit at St. Anthony Medical Center. Thus, the very existence of a referral agreement proves that patients travelled to the "referred" or "referral" hospital for special treatment not available at their local hospital. (Tr. 1784–85). Furthermore, if possible, the referring hospital will choose a hospital to refer a patient to with the understanding that the "referring" hospital will not lose its primary and secondary patients to the "referral" hospital. (Tr. 97, 419).

There are several referral agreements between the defendants and community hospitals in and around the ten county area. (FF. ¶ 81, 84, 97, 107, 115–16, 119). This reveals two things about the immigrating patient and the community hospitals. First, patients travel to Rockford because certain services are not available at their local community hospitals. Second, and to a much lesser extent, these community hospitals are not worried about losing their primary and secondary patients to the Rockford hospitals.

In sum, the court finds that a significant number of the 25% of patients migrating into the Rockford hospitals are seeking services not available in their local hospitals suggesting that three Rockford hospitals are the only relevant competition and the "Rockford area" is the relevant geographic market. Nevertheless, even if a number of immigrating patients travel to Rockford for special services, the very existence of such a large segment of immigrating patients indicates that there still may be competition and competitors outside the "Rockford area" which could exert market discipline on the merging entities. Thus, the preceding finding does not close the inquiry into the appropriate geographic market.

*The Defendants' Market*

As mentioned above, the defendants argue that 25% is "quite a bit of leakage" and explain that the reason for the leakage is simply that the government's market is too small. They contend, in fact, that it is approximately nine counties too small. The defendants attempt to define the relevant geographic market by primarily relying on a study of patient origin and destination data known as the Elzinga–Hogarty test. The Elzinga–Hogarty test focuses on shipment patterns to identify geographically, pertinent competitors of merging firms. (Tr. 1120). In a hospital context, the test focuses on patient travel. (Tr. 1120).

The test consists of two separate measurements—Lifo and Lofi. In the hospital context, a Lofi or "little out from the inside" statistic signifies the percentage of patients in an area's hospitals who reside in the area (rather than outside the area). *See In re HCA*, 106 F.T.C. at 468 n. 7; (Tr. 1121–22). This statistic is useful in determining whether a substantial number of patients from outside the area travel into an area for hospitalization. *Id.* If so, that implies that hospitals located in the areas where those immigrating patients reside could act as a check on the exercise of market power by hospitals inside the area. *Id.*

A "Lifo" or "little in from out" statistic signifies the percentage of hospital patients from a particular area who remain in that area for hospital services. *Id.;* (Tr. 1123). This statistic is useful in determining whether patients in a particular area make substantial use of hospitals outside the area. *Id.* If so, that implies that hospitals outside the area could act as a check on the exercise of market power by hospitals inside the area. *Id.* In sum, Lofi measures the immigration of patients into

an area and Lifo measures the out migration of patients from an area. *Id.*

Ideally, an area should be delineated where "few" patients leave an area and "few" patients enter an area to obtain hospital services. The defendants define "little" or "few" as no more than ten percent. (Tr. 1123–25). In other words, the Lofi and Lifo figures should ideally yield at least percentages of 90% or greater.[12]

In order to implement the Elzinga–Hogarty test, a process must be followed. In DX 100, the defendants outline a step by step methodology to be employed as follows:

### HOSPITAL GEOGRAPHIC MARKET DETERMINATION

STEP 1(a): DETERMINE THE MERGING HOSPITALS' SERVICE AREA, I.E., THE AREA FROM WHICH THEY DRAW 90 PERCENT OF THEIR BUSINESS.

STEP 1(b): DETERMINE THE COLLECTIVE SERVICE AREA OF ALL HOSPITALS LOCATED WITHIN THE MERGING HOSPITALS' SERVICE AREA.

\*\*\* THIS AREA SATISFIES THE LOFI TEST (i.e., LITTLE OUT FROM INSIDE).

STEP 2: DETERMINE THE AREA CONTAINING THOSE HOSPITALS THAT SUPPLY 90 PERCENT OF ALL THE BUSINESS THAT COMES FROM PATIENTS RESIDING IN THE COLLECTIVE SERVICE AREA.

\*\*\* THIS AREA SATISFIES THE LIFO TEST (i.e., LITTLE IN FROM OUTSIDE).

\*\*\* THE HOSPITALS IDENTIFIED BY THIS PROCEDURE ARE WITHIN THE GEOGRAPHIC MARKET RELEVANT TO THE PROPOSED MERGER.

(Tr. 1121).

Utilizing this methodology, the defendants arrived at their proposed ten county geographic market with a resulting Lofi of 91% and Lifo of 80.5% using patient admissions data and a Lofi of 90% and a Lifo of 74.7% using patient charges data. (DX 104, 105).

The court, however, is not convinced of the dispositiveness of the defendants results. While the court acknowledges the general efficacy of the Elzinga–Hogarty model, the court is wary of the defendants' application. In particular, the court perceives a rather result-oriented bent in the defendants' application of the Elzinga–Hogarty test; using the numbers to confirm a predetermined market rather than to help determine a market in the first place.

Through the use of four exhibits and their corresponding underlying data, the

---

**12.** Before delving further, it is also important to note that two well known circumstances tend to overstate or understate the Elzinga–Hogarty test.

The test can understate its market when customers between two producers are divided between A and B on either side of a point between A and B. These circumstances can produce one market for A and another for B. However, in the event one producer sought to exercise market power, customers may be willing to travel (out of the market) to the other producer. In sum, the static market is smaller than the market after an exercise of market power and thus by definition is understated.

The test can overstate the market where geographic price discrimination is employed. Because the product or services cannot be resold, a producer could control the competitive effect of its exercise of market power by pricing its services or product differently to one segment of the market as opposed to another. For example, a producer could raise prices only to customers located closer to the producer and with fewer alternatives than more distant customers with more potential alternatives. (Tr. 1125–1128).

Neither side has demonstrated the existence of circumstances indigenous to an understatement of the market. On the other hand, the government has attempted to show the potential for price discrimination in the merging hospitals' geographic market. The government points out that inpatient services cannot be resold. Further, the government highlights the different prices given different purchasers by the merging hospitals for the same services—different HMO's, PPO's and insurers receive different prices for the same services. The government, however, has failed to demonstrate one important link. There is no evidence of different purchasers representing different geographic segments. The government fails to identify one purchaser associated with a specific geographic segment, other than the "Rockford area." (Tr. 1129).

defendants fashioned their version of the Elzinga–Hogerty test.

*DX 118 and DX 102*

Using step one of DX 100, the defendants determined their service area or, in other words, the area in which the defendants receive 90% of their admissions. Utilizing 1985 patient origin data arranged by zip code, the defendants accomplish this task by tabulating the zip codes accounting for 90% of the hospital's admissions. Starting at the hospitals and building outward, the defendants constructed a service area encompassing an area equivalent to a circle with a twenty-five mile radius centered at the defendants' hospitals. The defendants however, curiously included within this "service" area three zip codes skirting the outside circle (60129, 53520, and 60111) that failed to contribute any patients to the defendants' admissions. (DX 118, 129).

Next, according to DX 100, is step 1(b). Step 1(b) is designed to determine the "collective service area" of all the hospitals located *within* the merging hospitals service area. Logically, step 1(b) would be completed by determining the service areas of hospitals located within the merging hospitals' service area and then aggregating all the service areas together to arrive at a "collective service area." Dr. Lynk, the defendants' expert, described the tasks he performed in preparing step 1(b) as follows:

starting with the service area, I have simply identified those hospitals located in zip codes that are literally adjacent to that service area as alternatives that at least those patients living in that part of the service area would turn to as alternatives.

(Tr. 1114–115).

\* \* \* \* \* \*

identify other hospitals that although not literally continguous to the service area were about equally far from Rockford as other zip codes that had previously been identified by this principle of contiguity that I mentioned earlier

(Tr. 1115).

Through this method, Dr. Lynk categorized "Winnebago area" hospitals as an "A" if they were within the merging hospitals service area, as a "B" if they were contiguous to the service area, and as a "C" if although not contiguous the hospitals were almost as close as hospitals that are contiguous. (Tr. 1186; DX 119).

When pressed on cross-examination as to whether the hospitals categorized as a "B" or a "C" on the defendants' exhibit 118 were identified using Elzinga–Hogarty methodology, Dr. Lynk responded:

the delineation in Exhibit 118, the ancillary analysis of the outlying counties in Ex. 9. I mean, these are not—I think these are useful inquires but these are not, strictly speaking, a part of the Elzinga–Hogarty test itself. So, they get at some of the dynamics of patient origin and destination apart from being part of the formal methodology of the list

(Tr. 1207–08).

\* \* \* \* \* \*

... that the intuitive logic was that once you found the service area, they could opt out of the service area just as easily as opting into the service area, and identified hospitals that were literally contiguous to or adjacent to the service area and suggested them as obvious candidates.

(Tr. 1208).

\* \* \* \* \* \*

I certainly looked at the geographic distribution of these hospitals; and based not formally on the test, but on observation of the distances, they appear to be potentially competitively significant.

(Tr. 1210)

Based on Dr. Lynk's testimony on cross examination, it is obvious that DX 118 does not represent a formally completed step 1, (a) and (b). DX 118 fails to present a consolidation of the merging hospitals' service area with the service areas of hospitals located within the merging hospitals' service area. In more concrete terms, DX 118 does not represent the combining of the service area of RMH and SAH with St. Anthony, Beloit Memorial, St. Joseph's,

Highland, and Rochelle Community's service areas.

Moreover, even taking Dr. Lynk's version of step "1(b)" at face value, there are problems with the "intuitive logic" employed. First, as mentioned earlier, Dr. Lynk tacked on three zip codes into the RMH and SAH service area, even though none of them contribute to either RMH or SAH admissions. Dr. Lynk now uses these "empty" zip codes as the boundaries of the merging hospital's service area that are contiguous to three "B" category hospitals —Kishwaukee, Sycamore and Mercy Janesville. In effect, these hospitals are not contiguous since these zip codes should not have been included in the merging hospitals service area in the first place.

Second, Dr. Lynk estimates that "they [patients] could opt out of the service area as easily as opting into the service area." (Tr. 1208). Presumably, Dr. Lynk was referring to the patients in the zip codes skirting the edges of the service area ("at least those patients living in that part of the service area would turn to alternatives"); in that it would be just as easy, if not easier, for these patients to travel out of the service area as into the service area. (Tr. 1114–15, 1208). The zip codes bordering the edge of the 25 mile radius service area, however, account for only 3.8% of the 90% of patients admitted to RMH and SAH. This is a rather thin reed to justify adding 12 hospitals. (DX 118, 129).

Finally, Dr. Lynk described the hospitals contiguous to the service area as "obvious candidates." (Tr. 1208). Included among those obvious candidates is Sycamore Hospital. In DX. 118, Dr. Lynk is suggesting that Sycamore Hospital should be included in the geographic market because of its ability to constrain the merging hospitals' exercise of market power. Sycamore Hospital, however, is in the process of terminating its inpatient operations. (Tr. 1655–56). While the inclusion of Sycamore Hospital may simply be an oversight, the oversight exposes Dr. Lynk's determination of the collective service area as a "seat of the pants" estimate made under the guise of an empirical study.

When asked if a Lifo figure determined by step 1(a) and (b) of exhibit 100 was ever calculated, Dr. Lynk responded as follows:

You mean the Lofi (patient immigration) figures

\* \* \* \* \* \*

That wasn't specifically tabulated or summarized in a table form. Its simply a list of zip codes with a cumulative percentage just hits 90.
(Tr. 1297).

\* \* \* \* \* \*

My recollection is it is the yellow area [on DX 118] plus somewhere around the order of four to a half a dozen additional zip codes.
(Tr. 1297).
As I say, I haven't separately tabulated it. It would have been part of my workpapers.
(Tr. 1298).

The preceding testimony basically concedes that step 1(b) as officially set out in DX 100 was never actually tabulated. Dr. Lynk, however, indicates that DX 102 is an application of the Elzinga–Hogarty test and that "based on Exhibit 102, the test [Elzinga–Hogarty] itself suggests that indeed they [contiguous and near-contiguous hospitals—categories "B" and "C"] are [competively significant], certainly on a charge basis." (Tr. 1210).

Dr. Lynk's assertion that DX 102 is an application of Elzinga–Hogarty is not entirely accurate since the test, as outlined in DX 100, is a cumulative test using the results of the first step (Lofi) in calculating the second step (Lifo). In this case, step 1 was not performed using the Elzinga–Hogarty methodology outlined, and if the "collective service area" was not determined via Elzinga–Hogarty then the second step is tainted with ad hoc data. Nor can DX 102 corroborate, as suggested by Dr. Lynk, the assumptions of DX 118 since the data in DX 102 is not independent of the calculations of DX 118.

In sum, DX 118 and DX 102 do not follow the defendants' own methodology for the Elzinga–Hogarty test as outlined in DX 100; rather, *ad hoc* assumptions re-

placed the tabulation of a consolidated service area and resulted in expansive Elzinga–Hogarty test results.

*DX 104 and DX 105*

The defendants next turn to two exhibits (DX 104 and 105) which are based on patient charge and admission data, respectively, to demonstrate Elzinga–Hogarty calculations on their proposed ten county market. The ten county market corresponds to the ten counties that encompass the hospitals identified in DX 118. (Tr. 1135). The calculations for the ten county area are straightforward and yield the following results:

Admission data: Lofi Lifo
 91.0% 80.5%

Charges data: Lofi Lifo
 90% 74.7%

(DX 104, 105). The defendants assert that these figures support their proposed market.

The court finds that, rather than supporting the ten county market, the defendants' exhibits 104 and 105 belie the defendants' result-oriented approach. First, rather than test various combinations of counties in search of the combination yielding the highest Lofi and Lifo figures, the defendants begin and end their inquiry with their ten county market. (DX 104, 105). Granted, the ten counties do correspond to counties containing the hospitals identified in DX 118, but DX 118 was not calculated using a pure Elzinga–Hogarty analysis.[13] Nevertheless, the defendants do not compare their ten county figures with any other potential market, even in light of the fact that the ten county's Lifo figure does not meet the 90% cutoff described in DX 100 or even a 75% cutoff using charges based data. (DX 104, 105).

Using the data supplied in DX 104, the government (and the court) has calculated Lofi and Lifo figures for various combinations of counties.[14] The most notable numbers are as follows:

| | LIFO | LOFI |
|---|---|---|
| W, B, O, R, S & D | 81.4 | 86.8 |
| W, B, O, R & S | 82.2 | 84.1 |
| W, B, O, R, S | 81.5 | 82.7 |
| W, B, O | 85 | 78.9 |
| W, O, B & D | 80 | 83 |
| W, B, O, S, Mc, D, & LEE | 77 | 88 |
| W, B, O, & S | 85 | 81 |

(GX 58, DX 104). While none of the different combinations match the 90% Lofi figure in the ten county area, some combinations come close, and all of the aforementioned combinations surpass the ten county's Lifo figure. This parity among the different combinations of counties with regard to the Elzinga–Hogarty figures casts doubt on the superiority of the defendants' ten county area, and the defendants' commitment to find the true market.

Another reason DX 104 and 105 appear result oriented is the inclusion of Walworth, Green and Rock County into the market. If one were to merely eyeball the charges or admissions of patients residing in these counties into the Rockford hospitals, it would appear obvious that these residents represent a miniscule fraction of admissions and charges. Indeed, using charge data, Rock, Green, and Walworth counties represent approximately .3% of admissions to the three Rockford hospitals. (DX 104). By comparison, counties beyond the ten county area account for over 6% of Rockford hospital admissions. The next lowest contributing county, Lee, accounts for 2.6% of Rockford admissions. The numbers are even smaller using admission data. (DX 105).

One final testament to the lack of importance to be placed in Rock, Green and Walworth counties is the Lifo and Lofi figures yielded by a combination of the seven Illinois counties. The seven Illinois counties' Lofi figure is 88%. (DX 104; FF, ¶ 122). Of the remaining 12% of patients immigrating into the seven county area only 1.4% reside in the three Wisconsin counties. (DX 104; FF, ¶ 122). The seven

---

**13.** The defendants continue to build on the faulty foundation of DX 118.

**14.** The defendants' expert Dr. Lynk favors the use of the patient charge data since it more

accurately reports the importance of specific patients; not only reflecting the mere fact the patient entered the hospital but also the amount of charges. (Tr. 1133).

Illinois county Lifo figure is 77%. (DX 104; FF, ¶ 122). Of the 23% of the seven Illinois counties' residents leaving the seven counties for hospitalization only 2% travel to the 3 Wisconsin counties. (DX 104; FF, ¶ 122). To include three entire counties despite their paltry contribution to the market further supports the notion that their insertion was substantially result-oriented.

One final reason DX 104 and 105 appear result-oriented is the use of county based data instead of the more accurate zip code based data. (Tr. 1135). The reason is simply that the more aggregated the data the more distorted the market. If for example, a hospital draws 90% of its patients from the county in which it is located (containing two other hospitals) and from zip codes in the corners and tips of surrounding counties (areas without competing hospitals) the test results will accurately reflect few competitors. However, if the patient origin data is aggregated on a county-wide basis, then all that is known is that a certain percentage of the hospital's patients originate in other counties. Thus, the whole county is included in the hospital's service area, allowing hospitals in other parts of the outlying counties to be considered a relevant competitor when more accurate data would have dispelled this notion. In short, county based data is a cruder way of evaluating a geographic market and clouds the picture. (*See* GX 59; Tr. 1278).

In sum, the defendants' calculations have attempted to confirm their proposed ten county market by expanding the market at every occasion. First, the defendants calculated the merging hospitals' service area by adding zip codes until 90% of the defendants' admissions were accounted for. In the process, the defendants added zip codes skirting the edge of the "service area" that failed to contribute any patients to the merging hospitals. Next, instead of calculating the combined service areas of the merged hospitals and the hospitals lying in the merged hospitals' service area, the defendants' expert ignored his own methodology and roughly estimated which hospitals "competed" with the defendants. The defendants' expert based his estimates on the principle of contiguity, even though

five alternative hospitals were not contiguous and the principle of contiguity was not referred to in the defendants' exhibit outlining the defendants' Elzinga–Hogarty methodology.

Using the *ad hoc* "collective service" area in DX 118, the defendants' next calculated the Lifo figures in DX 102. Even using hospitals in the ten county area, the Lifo figure did not reach the 90% cutoff.

The defendants then transferred the alternative hospitals located using zip code aggregated data to county aggregated data by tabulating Lifo/Lofi figures for the ten counties encompassing the alternative hospitals. The defendants' figures yield a Lofi figure above 90% but a Lifo figure below 75% based on patient charges data. Nevertheless, the defendants did not compare the ten county Lofi/Lifo figures to any other market and tabbed the ten county area as the relevant geographic market. Ironically, the greater than 25% leakage represented by a Lifo figure of 74.7% did not trouble the defendants as much as the 25% leakage represented by the government's market and its Lofi figure of 75%.

Accordingly, the court does not concur with the defendants' proposed geographic market, but will instead attempt to determine its own market based on the evidence presented at the preliminary hearing.

*Elzinga–Hogarty as a Guide*

First, the court's criticism of the defendants' application of the Elzinga–Hogarty test was not meant as a blanket indictment of the test. On the contrary, the court subscribes to the Elzinga–Hogarty test as a useful tool for eliminating certain geographic areas from consideration as relevant markets. The court will employ the defendants' Elzinga–Hogarty information, such as it is, to help pare the geographic market to its appropriate size.

*90%/75% Dilemma*

According to economic literature cited at trial, a market yielding Lifo and Lofi figures equal to, or greater than, 90% represents a "strong" market while a 75% figure represents a "weak" market. (Tr. 1123–25). This guideline, however, other than

setting general parameters, is of minimal utility since it suggests little more than that as the percentages increase, your confidence in your market should also increase. These guidelines do not provide answers to what percentage corresponds to an "appropriate" market, or if even such percentage exists, given the infinite number of variables that exist in any given competitive market. For example, if the reason a large percentage of patients immigrating into a market is lack of adequate hospitals in the surrounding area, the smaller Lifo–Lofi cutoffs (i.e. less than 90%) may be appropriate since the very reason the patients are immigrating into an area proves that the surrounding firms are not relevant competition with the ability to constrain an exercise of market power by the market participants. (Tr. 764–70).

Given the test's mission to quantify certain aspects of the geographic market and not as an infallible guide to resolve the market, it is not wise or necessary to begin every new Elzinga–Hogarty inquiry with a specific percentage in mind. (For instance, the 90% figure is merely a preference). (Tr. 1123–25, 1243–47). Instead of shaping the market to fit preconceived notions, the examiner should simply allow the figures and market to take shape and let the "appropriate" market and percentages rise to the surface.

For example, after settling on a five county area, including Winnebago, Boone, DeKalb, Rock, and Ogle counties, Dr. Frank Sloan, an economist hired by St. Anthony's to assess the merging hospitals geographic market remarked:

> To reach the 90 percent LOFI—90 percent LIFO standard, we would have to increase the size of the geographic market considerably. The resulting area would satisfy the numeric standard but would be unreasonably large to anyone

familiar with the Rockford area. [None of Dr. Sloan's potential markets reached the 90% plateau for either LIFO or LOFI].

(DX 78 at 4).[15]

Dr. Sloan's point is simple; if reaching the 90% Lifo/Lofi figures is unrealistic, using a smaller percentage is no sin. The Elzinga–Hogarty test should be driven by common sense and not the other way around.

Understanding that specific percentages need not be met, the question of how to recognize the appropriate number in a given context remains. Again, reminded of the test's ability to separate relevant areas and competitors from irrelevant ones, a pattern of results demonstrating the marginal utility or significance of a specific area or competitor in relation to the market as a whole is a good indication that the area or competitor should be eliminated. (Tr. 1312–13). In other words, if adding certain areas or competitors to the market does not appreciably increase at least one of the figures (LOFI or LIFO), without decreasing the other, then that area should probably not be included in the market. Of course, one must not forget the theoretical underpinnings of the test and that certain minimum numbers should probably be met. (i.e. Lofi/Lifo = 75%) (Tr. 1124).

Armed with this fresh perspective, but the same figures as the defendant, the court re-examines the patient origin and destination data provided in DX104, GX58, DX118 and DX102.

After reviewing GX58 and DX 104, the court notes the inverse nature of the Lofi/Lifo figures for the parties' respective markets. The defendants' proposed market yields a Lofi of 90% and a Lifo of 74.7%.[16] The government's market yields a Lofi of 71% to 75% and a Lifo of 93%.[17]

---

**15.** The study completed by Dr. Frank Sloan used a 20% sampling of 1985 Medpar data.

**16.** In more concrete terms, based on a Lofi of 90%, only 10% of admissions of hospitals located within the ten county area come from patients residing outside the ten county area. Based on a 74.7% Lifo figure, 26.3% of the patients living in the ten county area are hospitalized in hospitals located outside the ten county area.

**17.** The government's figures were not derived separately from DX 104 and 105. The Lofi figure varies depending on the data used (71% for IHA and approximately 75% for Medpar data). (GX 8).

(Tr. 1148, DX 8, 764, 944). A further review of the various combinations of counties making up a variety of potential markets reveals that, as the number of counties in the market increases the Lofi numbers generally increase and the Lifo numbers generally drop. The following graph will illustrate this phenomena:

| | LIFO | LOFI | AVE |
|---|---|---|---|
| "Rockford area" | 93% | 71–75% | 82–84% |
| W, O, B | 85% | 79% | 81.9% |
| W, O, B, D | 80% | 83% | 81.5% |
| W, O, B, R, S, D | 81.4% | 86.8% | 84.1% |
| W, B, O, S, Mc, D, L | 77% | 88% | 82.5% |
| "ten county area" | 74.7% | 90% | 82.4% |

(DX 104).

The trend is fairly consistent and the exceptions that exist do not vary greatly.

The close array and inverse relationship of Lifo/Lofi figures for the various markets also demonstrates the marginal utility phenomena outlined above. In particular, starting with a base market made up of Winnebago, Boone and Ogle County, the addition of counties to the base market makes relatively little difference from a Lofi/Lifo standpoint unless one has a preference for reaching a higher Lofi than Lifo figure. (Tr. 1215–16). In other words, adding counties onto a Winnebago, Ogle and Boone County market only serves to increase the Lofi figure and decrease the Lifo figure and does nothing to objectively strengthen the market. (Tr. 1216).

If one fine tuned the inquiry, however, by averaging the Lifo–Lofi percentages, then one would discover that adding counties to the original three county area would increase the average Lifo/Lofi figure. (Tr. 1220). In particular, adding Rock, Stephenson and Dekalb would produce an average Lofi/Lifo figure of 84.1% or 2.2% above Winnebago, Boone and Ogle Counties' 81.9% Lofi/Lifo average. This six county area produces the largest average Lofi/Lifo figure among the realistically possible markets. The 2.2% increase over the three county market, however, is only marginally greater than the average gener-ated by the base market. Given that both markets meet the minimal standards of Elzinga–Hogarty (Lifo/Lofi –75%) and that the six county area nor any other realistic combination of the ten counties significantly improves upon the three county market made up of Winnebago, Boone and Ogle, there seems to be little reason to go much beyond these three counties to find the relevant geographic market.

The smallest area required to satisfy the Elzinga–Hogarty test is the appropriate one, since areas larger than that do not necessarily reflect the ability of hospitals in any sub-area to exercise market power. (Tr. 1313). Since the Winnebago, Boone and Ogle market is the smallest area to satisfy the test, it appears to be the one which most accurately encompasses those hospitals to which area physicians and their patients probably turn for health care. Accordingly, our Elzinga–Hogarty analysis indicates that Rock, Green Walworth, Lee, Stephenson, McHenry and DeKalb counties should be eliminated.

Unfortunately, as mentioned above, the data in DX 104 is aggregated on a county wide basis, making it much more difficult to accurately determine significant competitors of the Rockford hospitals. The data utilized in DX 118, 129 and 102, however, is aggregated on a zip code basis.

Using the zip-code based figures in DX 118, and 129, the court plotted the percentage of admissions contributed by every zip code making up the defendants' 90% service area. Interestingly, the court found that many of the zip codes included in the market (53520, 53511, 53525, 60033, 60098, 60145, 60111, 60178, 60115, 60129, 61039, 61067, 61018) contributed .1% or even 0% of admissions to the merging hospitals and that these zip codes lie on the very outskirts of the defendants' service area in six different counties surrounding Winnebago County. Again using the principle of marginal utility, the court excluded those mar-

ginal zip codes from the market.[18] The resulting market still accounts for 87.3% of the defendants' admissions and encompasses all of Winnebago County, most of Boone County, the northeast part of Ogle county, and a small portion of McHenry, DeKalb and Stephenson Counties. This 87.3% service area contains only six hospitals—the three Rockford hospitals, two Boone County hospitals and one Ogle County hospital.

The next step is to determine the consolidated service area by combining the service area of the six hospitals. Of course, neither this step, nor any underlying data were furnished at the preliminary hearing. (*See* Tr. 1303). Nevertheless, DX 102, representing the Lifo, or second step of the defendants' original Elzinga–Hogarty analysis, is instructive for purposes of eliminating some significant competitors from the market. DX102 lists all the hospitals in the defendants' ten county area and then tabulates the percentage of residents of the ten county area that used those hospitals.

Ideally, of course, a cumulative service area tabulated by the court should be used, calculating the percentage of the residents of that cumulative service area utilizing hospitals contained in that cumulative ser-

18.

vice area. GX 102 will serve as a crude but adequate replacement.

Indeed, the six hospitals found to be in the service area calculated by the court and one other hospital, Beloit Memorial, account for 83.09% of all the hospital charges incurred by residents of not just the service area outlined by the court, but of the charges incurred by residents of the entire ten county market.[19] (DX 102). Further, the remaining eleven hospitals together account for only 5.4% of charges incurred, with no single hospital accounting for more than 1.42%. (DX 102). The marginal utility of these hospitals are insignificant, prompting their removal from the market. Indeed, Dr. Lynk remarked "that the closer to the marginal hospital or the closer you get to the end of the list of hospitals which are probably significant, the less significant are those hospitals. That's how you know you're near the end of the list." (Tr. 1313).

It is important also to note that the likely cumulative service area for the merging hospitals is much smaller than the ten county cumulative service market outlined in DX102. Accordingly, the figures for the actual cumulative service market would most likely yield higher numbers for the six hospitals in the merging hospitals service area and even lower numbers for hospitals outside the service area. This result also indicates that the other hospitals are not relevant competitors.

The net effect of the court's analysis of patient destination and origin data results in the elimination of several areas (and consequently competitors) from the Rockford area. Moreover, the data seems to reflect that the government's market is much closer to reality than the defendants'.
Other Evidence

As mentioned above, an examination of patient origin and destinations is only one step in defining a geographic market. Oth-

er evidence revealing the unique aspects of the market and the perceptions of providers and purchasers needs to be addressed.

The defendants supplemented their Elzinga–Hogarty results by arguing that Rockford hospitals not only competed with community hospitals but also directly competed for patients in the areas between the Rockford hospitals and the various community hospitals. The defendants supported these assertions by pointing to comments in a book authored by Mr. Michael Rindler, Beloit Memorial's chief administrator. The comments suggest that in the past many Beloit area residents immigrated to the three Rockford hospitals. The defendants also point to comments by Mr. Wayne Fesler of Kishwaukee Community Hospital and Mr. Dennis Hamilton of Freeport Memorial which indicate that the hospitals compete for inpatients in areas between the Rockford hospitals and the respective community hospitals.

The court acknowledges that, to a greater or lesser extent, there is some overlap between the Rockford hospitals' patient base and the patient base of the smaller outlying community hospitals such as Beloit Memorial, Freeport Memorial, and Kishwaukee Community Hospital. This is only natural, since rare is the market where a "no man's land" is found between different producer's service areas. *See Philadelphia*, 374 U.S. at 360 n. 37, 83 S.Ct. at 1739 n. 37.

The more probative inquiry is whether this overlap is significant for anti-competitive purposes. Patient origin and destination statistics indicate that what overlap that does exist is insignificant. *See Id.* (DX 118, 129, 102, 104, 105). As demonstrated in the court's examination of DX 118, 119, 129, the alleged zip codes in the merging hospitals service area contiguous or nearly contiguous with a variety of community hospitals only accounts for approximately 3% of the admissions to the merging hospitals. For example, the three zip

---

**19.** Based on patient charges data, 88.49% of the residents hospitalized in the "consolidated service area" used "consolidated service area" hospitals. Based on patient admission data, 91.58% of the residents hospitalized in the "consolidated

service area" used "consolidated service area" hospitals. Interestingly, using the charge data, the Lifo figure for the "consolidated service area" does not reach the 90% cutoff. (DX 104, 105).

codes (61018, 61067, 61039) immediately adjacent to Freeport Memorial and between Freeport Memorial and the merging hospitals account for only .3% of defendants' admissions. (DX 118, 119, 129). The four zip codes (60111, 60129, 60146, 60145) in DeKalb County between Kishwaukee Community and the defendants account for only .4% of the defendants' admissions. (DX 118, 119, 129). While Beloit Memorial is located closer to the defendant hospitals, the six contiguous zip codes (zip codes 53520, 53511, 53525, 61079, 61072, 61802) still only account for 1.7% of the defendants' admissions. (DX 118. 119, 129). These numbers do not portend a great deal of competition for the patients in the areas between the community hospitals and the defendants.

Undoubtedly, the drawing of geographic lines for purposes of the Clayton Act is somewhat artificial and arbitrary and there will be some competition that is ignored. The key, however, is that this competition must not play a significant role in the defined geographic market. The origin and destination evidence shows that competition does exist in the brackish areas between the defendants and the community hospitals such as Freeport Memorial, Kishwaukee Community and Beloit Memorial, but this competition, however important to the community hospitals, is of no great moment for the defendants.

The defendants also rely on the fact that many patients in the counties surrounding Winnebago travel for inpatient healthcare. In DX 9, the defendants illustrate this phenomena with a bar graph. The percentage of Boone, McHenry, Stephenson, Ogle and DeKalb county residents who travel for healthcare is presented. Of the six counties, however, only two of the counties, Boone and Ogle, have a significant amount of their residents traveling into Rockford for inpatient care. The other counties, as already demonstrated, contribute a much smaller percentage of patients to the Rockford hospitals. (DX 9).

The defendants are not only concerned that the competition between community hospitals and the defendants is reflected in the geographic market but also that the competition between the defendants and several regional tertiary referral centers is reflected in the geographic market.

The defendants presented evidence at the hearing on the wide range of competition between tertiary hospitals in the northern Illinois—southern Wisconsin area for tertiary patients. The defendants cited the "circuit riding" of Swedish American's Dr. Henry drumming up tertiary referrals in areas as far away as eastern Iowa and central Illinois. (Tr. 1990–99). As further evidence, the defendants highlight the glut of referral agreements between the defendants and hospitals from across the region. (Tr. 1638–90). The defendants also refer to the regional market delineated by St. Anthony's in its certificate of need ("CON") application for a new MRI. (DX 60). The defendants also elicited testimony from an administrator for Meriter Hospital in Madison, Wisconsin and Sherman Hospital in Elgin which revealed that the defendants compete with their hospitals in the provision of tertiary services. In sum, the defendants paint a picture of ever increasing competition between large hospitals for lucrative tertiary patients.

The court is convinced that the competition for providing highly specialized tertiary services is wider than the provision of every day inpatient care. (FF, ¶ 123–125; Tr. 91–94). Again, the question must be whether this competition is significant enough to expand the geographic market. *See Philadelphia*, 374 U.S. at 360–62, 83 S.Ct. at 1740. In other words, do the tertiary referral centers in Iowa City, Madison, Milwaukee, Rochester, Elgin, and Chicago have the ability to constrain the exercise of market power by the defendants in providing most types of inpatient care? *Id.* (Tr. 120–21, 767). From the record in this case, the simple answer is no.

Presently, competition exists between tertiary hospitals for tertiary patients and referrals from small community hospitals. (Tr. 1995–97, 2044). The scope of this competition for tertiary patients at present, however, is limited. In particular, the competition between Sherman Hospital and St.

Anthony exists between their respective "Regional Heart Centers" and only in the "middleground" (i.e. McHenry County) between the two hospitals. (Tr. 1839, 1849, 1861, 1869). The competition between Meriter and the defendants exists, according to Ms. Anderson, primarily in Green, Rock and Walworth counties. (Tr. 1823). The court has already eliminated these counties from the defendants' geographic market. Moreover, the competition for referral agreements, while vigorous, must be put into perspective. The defendants' own patient origin/destination data shows most of the defendants' patients come from within 25 miles or less of the defendants. The tertiary referral patients outside this area and between Rockford and the other large tertirary referral centers make up some fraction of the remaining ten to fifteen percent of admissions, along with people taking ill as they pass through or visit the Rockford area and people who travel to Rockford on their own volition, based on the perceived quality of the hospitals or for services not offered at their local hospitals (without being referred). If indeed the defendants .exercised market power after merging, the ability of this fraction of referral patients to travel to another referral center would not constrain the defendants based on their relatively small numbers. In addition, there are almost no figures to indicate what hospitals compete for referrals in what areas and to what extent, so it is difficult to identify the tertiary referral centers competing for the defendants' referral business.

In sum, the court rejects the defendants argument to include tertiary referral centers as part of the geographic market.

### The Relevant Geographic Market

■ The court concludes that the geographic market should include the following six hospitals: Rockford Memorial, Swedish American, Saint Anthony, Highland, St. Joseph and Rochelle Community. It encompasses the following areas: all of Winnebago County, essentially all of Boone County, the northeast portion of Ogle County, and small fractions of McHenry (zip code 61052), DeKalb (zip code 60146),

and Stephenson (zip code 61019) counties. The court labels this area the "Winnebago–Ogle–Boone area" or "WOB." The court notes that a metes-and-bounds description of the geographic market is not necessary since the identification of the relevant competitors (i.e. hospitals) is the aim of defining a geographic market in the first place.

The court's rationale for finding this market closely resembles the rationale set forth by the government. First, physician and patient preferences for nearby hospitals is the main reason for keeping the geographic area relatively small. *See Philadelphia,* 374 U.S. at 358, 83 S.Ct. at 1739. The key, of course, is physician admitting patterns to the three Rockford hospitals and the three Rockford hospitals almost exclusively.

Second, the evidence demonstrates that the patients who do travel from outside the Rockford area do so a majority of the time for specialized care unavailable at their local hospitals. (*See* FF, ¶ 81–120). The fact that many of these patients travel to Rockford for specialty care does not bode well for the outlying community hospitals to compete away those immigrating patients if the defendants acted anti-competitively. In this same vein, the evidence shows the services offered by the community hospitals lagged significantly behind the defendants' in number, depth, and specializations. In addition, there is very little physician overlap between the Rockford hospitals and the surrounding hospitals. (*See* FF, ¶ 81–120). Third, the defendants themselves generally perceived that they compete with one another and Saint Anthony Medical Center. (Tr. 1799, 1801, 2016; GX 13).

Accordingly, if indeed there was a small but significant non-transitory price increase at the defendants' hospitals, it is very unlikely that patients inside the Rockford area would travel to the outlying community hospitals or that patients outside the Rockford area would stop immigrating into the Rockford hospitals. Additionally, third party payers would resist forcing their subscribers to travel in light of such an increase.

On the other hand, the court is also somewhat persuaded by an analysis of patient origin and destination data that the area outlined by the government was too small. The large influx of patients from Boone and portions of Ogle County could not be ignored. The court, of course, acknowledges that like other community hospitals Highland, St. Joseph, and Rochelle Community cannot provide all the services of the Rockford hospitals. However, the number of immigrating Boone and Ogle County residents is so great that the patients represent too large and important a patient segment to be ignored. Thus, even if tertiary patients still travelled to Rockford regardless of any price increase, the loss of Boone and Ogle County primary and secondary patients to the community hospitals would impose some discipline on the defendants' exercise of market power.

In sum, the court has arrived at an area where the defendants compete with four other hospitals for the group of patients representing about 90% of the admissions of the defendants. Any area greater would be unrealistic in that competitors in those areas do not compete to any significant extent for the same patients as the defendants. Any area smaller would ignore competitors who while small, do compete for a significant segment of the defendants' admission base.

Finally, the court understands that no boundary is perfect and always somewhat arbitrary, however, the court finds that these competitors and this area is as close to the real competitive market facing the defendants as can be determined from the evidence presented.

The court has attempted to determine the geographic market by utilizing every objective test available to it as produced by the evidence in this case. It has also applied all reasonable subjective information contained in the record in considering what the geographic market should be.

To this end, the court thoroughly examined the Elzinga–Hogarty test (Lifo–Lofi), the testimony and exhibits submitted by expert witnesses, the testimony of lay witnesses, the physical geography of the area, including the location of the respective hospitals. The court also applied a simple, commonsense, approach to the question of what the geographic market should be.

From such examination, by almost any measure, the court concludes the WOB area, consisting of Winnebago, most of Ogle, most of Boone and small parts of Stephenson and McHenry counties, most closely meets the criteria necessary to determine the geographic market.

Accordingly, the court finds that the WOB area, as described above, is the geographic market.

## EFFECT ON COMPETITION

After determining the relevant product and geographic market that the defendants operate in, the court, in a § 7 Clayton action, must judge whether the challenged acquisition "may be substantially to lessen competition" in that market. *Philadelphia*, 374 U.S. at 362, 83 S.Ct. at 1741. In other words, the court must focus on whether the proposed merger may hurt consumers by facilitating anti-competitive practices. *HCA*, 807 F.2d at 1386.

This determination is predictive by nature and requires an estimate of the merger's effect on the competitive conditions of the future. Therefore, proof of actual anti-competitive practices is not required; rather, evidence that these practices are likely to occur in the future is all that is necessary. This standard allows anti-competitive tendencies to be arrested in their "incipiency." *Philadelphia*, 374 U.S. at 362, 83 S.Ct. at 1741, *citing Brown Shoe*, 370 U.S. at 317, 322, 82 S.Ct. at 1519–20. To aid in this predictive determination, the court will address several salient competitive factors in the market including concentration, barriers to entry, nature of competition and market participants. *See HCA*, 807 F.2d at 1389.

*Concentration*

The relevance of concentration with regard to competition can be summed up as follows: "[c]ompetition is likely to be greatest when there are many sellers, none of which has any significant market

share." *Philadelphia*, 374 U.S. at 363, 83 S.Ct. at 1741; (Tr. 746, 774, 819, 1390–91) Conversely, the fewer competitors and the bigger the respective shares, the greater the likelihood of anti-competitive practices. Essentially, the fear of high concentration in a market is the exercise of market power by a dominant firm or a "cartel" (a banding together of the larger firms in a market). (Tr. 774). The "exercise of market power" is defined as the ability to raise prices above the competitive level. (Tr. 746, 864, 866–867, 1128, DX 89a).

In the dominant firm context, a firm with a large market share with few competitors of any significance (i.e. large market shares), will exercise market power by either directly raising prices above the competitive level, reducing or restricting output or reducing quality (i.e. costs) without a corresponding reduction in price. The dominant firm can exercise market power because it controls such a large segment of the market. Other firms cannot muster enough output (capacity) to accommodate all the customers seeking to avoid the dominant firms' exercise of market power (i.e. higher prices). (Tr. 774–75, 989) Thus, these customers are forced to pay prices above competitive levels.

In the cartel context, a few firms representing a large segment of the market collude, either explicitly or tacitly to raise prices, reduce or restrict output or reduce quality (costs) without a corresponding reduction in price. A cartel exercises market power by the same principle of market share as a dominant firm. The significance of concentration in a cartel context is the relative ease with which activities among a few sellers with large market shares may be coordinated, as opposed to several sellers with smaller market shares. By the same token, the relative ease of detecting and discouraging cheating among a few members of a cartel as opposed to several is also very significant. (Tr. 777).

In *Philadelphia National Bank, supra*, the Supreme Court explained the significance, for § 7 purposes, of an increase in the concentration of a market brought about by a horizontal merger as follows:

a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Philadelphia*, 374 U.S. at 363, 83 S.Ct. at 1741.

In other words, absent clear proof to the contrary, a horizontal merger violates § 7 of the Clayton Act if it produces a firm controlling an undue percentage of the post-merger market, and a significant increase in the concentration of the post-merger market.

Of course, to determine whether a significant increase in concentration occurs, one must be able to measure the concentration. One way to measure the concentration of any given market is the Herfindahl–Hirschman Index ("HHI"). (Tr. 1141). The HHI attempts to quantify a market's concentration by summing the squares of the individual market shares of all the firms in the market. This formula reflects the distribution of market shares between firms and gives proportionately greater weight to the market shares of the larger firms, which likely accords with their relative importance in any anti-competitive interaction. (Tr. 772, 1141, 1388).

The premise behind the formula is simple: a concentrated market will yield a large HHI number and an unconcentrated market will yield a smaller number. Indeed, a market with several competitors with very small market shares should garner an HHI figure approaching zero. On the other hand, a completely monopolized market with one competitor yields an HHI of ten thousand. (Tr. 1141–42). Based on Department of Justice guidelines, the government advocates that an HHI above 1800 indicates a highly concentrated market. Department of Justice Merger Guidelines, 49 Fed.Reg. 4.131.

Based on the formula, the court has calculated the HHI for the defendants' mar-

ket using three different bases of market share: state inventoried beds, inpatient admissions and inpatient days (all omitting psychiatric, rehabilitation, and substance abuse statistics). A preference for any of these bases is of little consequence since they all result in similar HHI figures. Also, the court calculated the HHI figures both taking and not taking into account the affiliation of Highland with SwedishAmerican (management contract) and St. Anthony's with St. Joseph's (both part of the chain of hospitals owned by the Sisters of the Third Order). Again, the figures are relatively similar in either event.

Using 1987 American Hospital Association data, the HHI figures are as follows:

| | Beds | Admissions | Days |
|---|---|---|---|
| Before Merger | 2555 (3184) | 2789 (3200) | 3026 (3331) |
| After Merger | 4603 (5648) | 5111 (5700) | 5647 (6167) |
| Net Increase | 2048 (2464) | 2322 (2774) | 2621 (2836) |

(HHI figure in parentheses recognizes affiliations of STA with St. Josephs and SAH with Highland. (DX 101; FF ¶ 125–126).

The results of the HHI calculations are stark. The effect of the merger between SAH and RMH is to substantially increase the concentration of an already concentrated market. As measured by the HHI, the concentration of the relevant market almost doubles. This is a particularly significant occurrence when one considers that the market before the merger is quite concentrated (HHI above 1800).

Moreover, these HHI figures are complemented by more traditional indications of a market's concentration: the number of competitors and market share percentages. Depending on the basis chosen, the defendants' RMH and SAH represent respectively approximately 32.5% and 32.2% (beds), 35.5% and 32.7% (admissions) and 37.7% and 34.7% (patient days) shares of the pre-merger market. (DX 101). After the merger, the two defendants represent 64% (beds), 68.2% (admissions), and 72.4% (patient days) share of the post-merger relevant market. (DX 101).

Using market share figures, the proposed merger creates a large increase in the relevant market concentration. In *Philadelphia, supra,* the pre-merger market's two largest firms controlled a 44% share of the market, and after the merger the top two firms would control 59% of the market. *Philadelphia,* 374 U.S. at 365, 83 S.Ct. at 1742. By comparison, in the instant case, the two largest firms (SAH & RMH) control approximately two thirds of the present market, and after the merger, the two largest firms (i.e. the merged entity and STA) will control 90% of the market. (DX 101).

Further, the merger reduces the number of competitors in the market from 6 to 5. Although this reduction from 6 to 5 appears rather innocuous, the merger eliminates the competition between the two largest competitors in the market, however defined (i.e. beds, patient days, admissions). If the affiliation of St. Anthony with St. Joseph and SwedishAmerican with Highland is factored into the market share determination, then the merged entity accounts for 70.4% (beds), 71.7% (admissions), and 75.3% (inpatient days) share of the post-merger relevant market. (DX 101). The merger then would reduce the number of competitors in the market from 4 to 3.

Of course, the elimination of a competitor is significant for anti-trust purposes only if it facilitates collusion among the remaining competitors. Hence, the greater the number of competitors eliminated and the larger their market shares, the easier it is for the remaining firms to coordinate their actions. (Tr. 746, 774, 819, 1390–91). In short, the fewer the remaining competitors of any significance (i.e. market share) the easier market dominance and/or collusion can be achieved. *HCA,* 807 F.2d at 1387. In the case at bar, the pre-merger market contains three significant competitors sharing approximately 90% of the relevant market in beds, admissions, and patient days. While even the pre-merger market could be considered ripe for collusion, consider the relative ease of colluding and market dominance in the post-merger relevant market where only two firms control 90% of the market and one firm (the merged entity) controls over two-thirds of the market.

To more fully understand the magnitude and significance of the relevant market's

concentration, one could compare the concentration of the relevant market in the case at bar and the Chattanooga hospital market in *HCA v. FTC, supra.*

In *HCA,* the post-acquisition market was dominated by four hospitals, one of which was the acquirer HCA. HCA's post-acquisition market share was approximately 25% of the beds, days, and revenues in the Chattanooga market. *HCA,* 807 F.2d at 1387. The competitors eliminated by the acquisition accounted for 12% of the market. *Id.* Based in part on these figures, the Seventh Circuit affirmed the FTC's finding that this four firm concentration of the post-acquisition market facilitated collusive behavior among the remaining firms. *Id.*

By comparison, the competition eliminated by the merger of RMH and SAH accounts for approximately 32% of the market as opposed to 12% in *HCA.* In addition, there will be only two significant firms remaining in the relevant market after the merger accounting for nearly 90% of the market as opposed to the four firms in *HCA.* Undoubtedly, if the concentration in the *HCA* post-acquisition market facilitated collusion, then the even higher concentration in the instant market could also be viewed as facilitating the likelihood of collusion.

The next important measure of concentration indicating anti-competitive behavior is whether one firm will control an "undue percentage share of the relevant market" as a result of the hospital merger. *Philadelphia,* 374 U.S. at 363, 83 S.Ct. at 1741. In this case the merged entity will account for nearly 70% of the beds, admissions, and inpatient days in the relevant market. (DX 101). In this regard, the Philadelphia Court found the following:

> Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.

*Philadelphia,* 374 U.S. at 364, 83 S.Ct. at 1742.

It can safely be stated that the merger of SAH and RMH would produce a firm controlling an undue percentage share of the relevant market, thus increasing the likelihood of market dominance by the merged entity or collusion. Accordingly, absent proof demonstrating that the merger is not likely to have anti-competitive effects, the concentration of the post-merger market will inherently lessen competition substantially in the relevant market.

*Barriers to Entry*

One reason concentration in the relevant market may not inherently lead to collusive or anti-competitive behavior is when existing competitors or new competitors could easily enter the market and provide enough capacity to defeat an exercise of market power. *See HCA,* 807 F.2d at 1387. In short, if customers could turn to new entries in the market in sufficient numbers to make the exercise of market power unprofitable for dominating or colluding firms, then any present concentration in the relevant market is irrelevant. Hence, it is necessary to measure the relative ease or difficulty of entering the relevant market.

In the instant case, a new entrant must overcome regulatory barriers to enter the relevant market. The Illinois Certificate–of–Need law presents a formidable barrier to persons wishing to provide new acute hospital inpatient care in the WOB area. Before a provider adds new bed capacity, purchases capital equipment worth more than four hundred thousand dollars or changes services offered, a certificate-of-need (CON) must be obtained from the Illinois Health Facility Planning Board, a state body. (Tr. 425–426).

The first burden placed on a potential market entrant (i.e. a new acute care hospital) by the CON is the expense and length of the CON application process. While the initial application process itself may take some time, historically the biggest delays occur when competing hospitals challenge the granting of a CON and/or an applicant who is originally denied a CON appeals to the state courts.[20] (*See* FF, ¶ 127–130).

---

**20.** For example, Chicago Medical School Huma-

na in North Chicago received a CON to build a

Moreover, there is no guarantee that a CON will eventually be obtained even after completing the expensive and often arduous application process. (GX 25). Consequently, the CON regulation, by definition, serves as a barrier to entry. A barrier to entry is anything that provides an incumbent in a market an advantage over a new entrant. For example, the incumbent's cost of providing inpatient facilities developed before 1974 (CON Law was enacted in 1974. *See* Ill.Rev.Stat. ch. 111½, ¶ 1) are inherently lower than a new entrant's cost in providing the same service. Thus, the CON law grants a hospital already within the market a decided cost advantage by burdening an entrant with delays, expenses, and uncertainties never shouldered by existing competitors. Except to the extent of new additions of equipment and services, incumbent providers did not have to endure the costly delays, expenses and possible rejection of the CON laws when first developing its inpatient facilities.

Beyond the administrative bugaboos of the CON application process, CONs are not readily granted to providers in markets where excess capacity exists. Simply put, the B–001 planning area (the area used by the Illinois Health Facilities Planning Board ("IHFPB") to assess the health facility needs of Winnebago, Boone and parts of Ogle County [excluding Rochelle]) has excess capacity. (Tr. 439–41; GX 29). In particular, despite the need for 16 additional beds in neonatal care and 1 additional bed in burn care, the B–001 area has 338 extra beds in medical-surgical, 12 extra beds in intensive care and 34 extra beds in obstetrics. (Tr. 442–44; GX 29). This excess capacity sounds a death knell for a new entrant's application, since the primary rationale for CON laws is to prevent unnecessary duplication of health care facilities. (Tr. 425). If a "planning area" has a substantial amount of excess capacity in inpatient care, as measured by excess beds, adding more beds to the market would be folly and surely rejected by the Illinois Health Planning Facilities Board.

(GX 25). This notion was confirmed in the context of the instant market by Mr. Ewing, the Project Review Administrator of the Division of Facility Review (the body that reviews CON applications upon their initial submission to the IHFPB). Mr. Ewing projects that it is very likely that a CON application to build a hospital comparable to the defendants' hospitals in the Rockford area would be rejected. (Tr. 455).

Even if the CON regulation did not exist, the demographics of the relevant market will bar anyone from building a new acute care inpatient hospital in the WOB area. First, the present hospitals have excess inpatient capacity. Second, the population base of the area is static. Third, the population is aging and the market is experiencing a shift from patients with charge-based payers, such as insurers and employers, to cost-based payers such as Medicaid and Medicare. (Tr. 134; GX 25 at R 43748). These demographic factors, according to the defendants, would preclude a new entrant from building an acute care hospital in the WOB area. (GX 25 at R 43748).

The defendants argue that while a new entrant is unlikely, existing competitors could expand and change their services to meet increased patient demand in the wake of an exercise of market power. The CON laws, however, also apply to a changing or expansion of services and the same principles apply as outlined above. (Tr. 425–426). Moreover, the colluding hospitals could stop, or at least delay, the change or expansion of service through collective opposition to the application. Using existing excess capacity and any further excess capacity produced by an exercise of market power, the resisting hospital(s) could argue that the new or expanded service is unneeded. *See e.g. HCA*, 807 F.2d at 1387.

Overall, the barriers to entry in the relevant market reinforce rather than diffuse the likelihood of anti-competitive tendencies marked by a concentrated market.

hospital in 1986. The granting of the CON was challenged and is presently pending in the state supreme court. The last CON to be granted to an inpatient hospital in Illinois that was not replacing an existing facility was in 1976. (Tr. 451–52, 454).

### Nature of Competition

The next factor in assessing the effect of the defendants' merger on competition is to examine the type of competition that exists in the acute inpatient hospital market in order to determine whether the market is susceptible to anti-competitive behavior.

Traditionally, hospitals competed on the basis of their attractiveness to physicians. Hospitals recognized that, in most cases, physicians controlled inpatient admissions to hospitals. Consequently, attracting competent physicians became a means to maintain and expand inpatient admissions. The hospitals would compete for physician affiliation through generous compensation packages and the "quality" of the hospital's equipment and facilities.

In recent years, competition in the acute inpatient hospital market in northern Illinois has experienced an increasing amount of price competition as well as an intensification of non-price "quality" competition. (Tr. 777–78). Several emerging forces have helped produce this new competitive landscape. First, the advent of new techniques and medical technology has allowed many types of traditionally inpatient care and treatment, including many diagnostic tests and types of surgery, to be performed on an outpatient basis. This trend has caused the number of inpatient days at hospitals to level out and in some cases drop. (Memo in Opposition to Motion for Prelim. Injunction, p. 22 n. 11). Moreover, the proliferation of outpatient services has also created direct competition for some of the more lucrative types of outpatient services between hospitals and outpatient providers. (GX 25 at R 43749–43751). Second, purchasers of healthcare have initiated an array of different "cost containment" measures in order to stem rising healthcare costs. Some of these measures used by third party payers are known as "pre-admission screening" and "current and post-discharge utilization review." Both methods are geared to prevent a patient from incurring unnecessary expenses by receiving relatively expensive inpatient hospital care when less expensive outpatient treatment, or no treatment, would suffice. (Tr.

1616–19). The effect of these efforts has also been to lower demand for types of inpatient care and reduce inpatient days. (Tr. 1619–22).

An even more direct method of "cost containment" was implemented by government third party payers, Medicaid and Medicare. These government payers switched from reimbursing hospitals based on the hospitals' full charges to reimbursement based on the cost of treatment. (GX 3 at R 315). In most cases, this cost-based reimbursement does not fully cover the hospitals' true cost of care. In addition, another form of unreimbursed care, indigent care, was also significant at the defendants' hospitals.

Another important change for purposes of price competition was the appearance of managed healthcare plans such as HMOs and PPOs. These group purchasers attempt to parlay a hospital's desire for a steady source of patients into a discount for its patients. (Tr. 530, 126, 139–40, 809, GX 5 at R 3445). Even more traditional third party payers have recently used competition for inpatients as a negotiating tool to secure more favorable pricing terms in hospital contracts. For example, government third party payers often choose hospitals based on pricing considerations. As explained by Ms. Thompson of ICARE, the Illinois agency implementing Medicaid in Illinois, ICARE seeks competitive bids from hospitals to serve (ICARE) patients in a designated area. (Tr. 274–275, 318).

The advent of outpatient services, cost containment and managed healthcare has resulted in downward pressure on inpatient and reimbursement levels at northern Illinois acute inpatient care hospitals. In turn, this has led the acute inpatient care market to become more price sensitive and competitive as hospitals attempt to attract steady sources of inpatients through lower prices. (Tr. 1775, 1890, 91). For similar reasons, non-price competition such as advertising and quality of care has also intensified, as each hospital desires to offer physicians and patients the latest medical technology and services in an effort to present itself as a full service high quality institu-

tion. (GX 13 at R 3769). The hoped-for result of these efforts, of course, is the attraction of quality physicians and more and better paying inpatients.

Based on the increasingly competitive nature of the relevant market, including increased price competition, increased competition for more profitable segments of a hospital's services, and increased competition for new medical equipment and services, hospitals in the relevant market could benefit from a variety of anti-competitive activity.

Non-profit Status

The defendants assert that regardless of the financial benefits, their non-profit status would prevent them from acting anti-competitively in the provision of acute inpatient hospital care. In particular, the defendants contend that they have no incentive to act anti-competitively because their decisionmakers cannot personally gain from the monopoly profits derived from an exercise of market power. The defendants maintain that anti-competitive activity occurs when a decisionmaker, specifically a decisionmaker with an ownership interest in a company who will share in the monopoly benefits garnered by his or her firm through anti-competitive activities, has a personal stake in the financial performance of his firm. The defendants conclude that such incentive exists in for-profit companies but not in not-for-profit companies. The defendants explain that decisionmakers in not-for-profit companies cannot "personally" benefit from monopoly profits since monopoly profits garnered by a not-for-profit company cannot be distributed to anyone, let alone corporate decisionmakers. Instead, any excess of revenues over expenses must be farmed back into the firm's operations or transferred to an affiliate. The defendants conclude that without a chance to share in the firm's surplus, a not-for-profit decisionmaker will not steer the firm into anti-competitive action.

The court would first note that non-profit status has not deterred other courts from finding anti-competitive activity and anti-trust violations. Specifically, a district court found collusion among several non-profit hospitals in their collective effort to resist a third-party payer's "cost containment" efforts. *United States v. North Dakota Hospital Ass'n*, 640 F.Supp. 1028 (D.N.D.1986). Of course, the Seventh Circuit affirmed the enjoinment of a hospital merger on the basis of a § 7 violation, aware of the fact that many hospitals in the market were not-for-profit hospitals. *HCA v. FTC, supra.*

Next, the court rejects the defendants' narrow view as to the motivation behind anti-competitive action. The defendants postulate that a decisionmaker will only be motivated to act in an anti-competitive capacity in order to gain personal profit. However, increased profits are only a means to an end. The money or liquid securities received by a corporate decisionmaker and owner will most likely be used to further some goal of the decisionmaker. Similarly, a not-for-profit company's fund balances, enlarged through monopoly profits, are a means to an end. The end may not be the personal wealth of the decisionmaker but could be for an objective held in nearly as great esteem.

The not-for-profit decisionmaker may desire more money for a new piece of equipment or to hire a new specialist or for a better office, salary or title, or to just keep the firm afloat in particularly lean or dangerous times. (Tr. 867, 869–70, 1382). A larger fund balance created through anti-competitive activity could help the decisionmaker to attain any of these objectives. (Tr. 823–24, 868). Simply put, decisionmakers need not be solely interested in the attainment of profit to act anti-competively.

As set out by Judge Posner in *HCA:*
The adoption of the nonprofit form does not change human nature, (citations omitted), as the courts have recognized in rejecting an implicit antitrust exemption for nonprofit enterprises. *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100 n. 22, 104 S.Ct. 2948, 2960 n. 22, 82 L.Ed.2d 70 (1984).

\* \* \* \* \* \*

Non-profit status affects the method of financing the enterprise ... and the form in which profits ... are distributed, and

it may make management somewhat less beady-eyed in trying to control costs, (citations omitted). But no one has shown that it makes the enterprise unwilling to cooperate in reducing competition ...— which most enterprises dislike and which non-profit enterprises may dislike on ideological as well as selfish grounds.

*HCA*, 807 F.2d at 1390. Any time not-for-profit objectives conflict with the objectives of a competitive market place, the not-for-profit hospital has incentive to act anti-competitively. (Tr. 800, 865, 1177–78, 1380–81).

Indeed, Judge Posner, writing for the the the Seventh Circuit in *HCA* specifically recognized that market pressures on "public hospitals" to charge higher prices to insured customers "may make collusion particularly attractive to these hospitals." *HCA*, 807 F.2d at 1391. As outlined previously, there are a variety of competitive pressures in the relevant market making collusion attractive to the defendants.

One of the more obvious benefits of collective action between the hospitals would be the stymying of "cost containment" efforts by third party payers. *HCA*, 807 F.2d at 1389. The colluding hospitals could refuse the efforts of payers to perform "utilization reviews" and "pre-admission screening." Without the information derived from these procedures, many patients would remain in or initiate inpatient care, despite other more cost effective alternatives.

Furthermore, collective effort among the hospitals could help resist third party payer's attempts to lower their reimbursement rates further. (Tr. 748, 809). *See e.g. HCA*, 807 F.2d at 1389; *North Dakota Hospital, supra.* The hospitals could further temper the downward pressure on reimbursement levels by cooperating with other hospitals in resisting the granting of discounts or at least reducing discounts to group purchasers such as HMOs and PPOs. (Tr. 778–79). Moreover, in light of the fact that inpatient services cannot be resold, colluding hospitals in the relevant market could pick and choose specific insurers, employers, or other third party payers to collude against. (Tr. 768, 952). For example, a hospital could resist "cost containment" efforts for less valued customers (Medicaid) to make up for the more attractive terms granted more valued payers (PPOs). (Tr. 338, 527, 769, 1315–16, GX 26, GX 7 at R 10838). More generally, the colluding hospitals could exercise market power in inpatient services to subsidize price discounts in the provision of lucrative outpatient services that directly compete with outpatient providers.

Through a collusive exercise of market power the hospitals in the relevant market could also eliminate "quality" competition that has been a major drain on the hospitals' budget. In order to remain attractive to both physicians and patients, competing hospitals in the market expend large amounts of money for the acquisition, regulatory approval, and advertisement of new high technology equipment and services. (GX 13 at 3770). This expensive form of non-price competition could be controlled through an agreement between the hospitals to divide up the acquisition of new equipment and services among themselves. This action would insure a hospital an unchallenged application and, if the application is approved, market for the service. "The ... technological ferment in the hospital industry may make collusion ... more urgent, since risk-adverse managers may be strongly inclined to stabilize, if necessary through collusion, whatever features of an uncertain environment they are able to bring under their control." *HCA*, 807 F.2d at 1391.

At this point, the defendants interject that their goals are not at odds with consumers and competition. Specifically, the defendants suggest that the hospitals are little more than "buyer cooperatives" in that the defendants' boards are composed primarily of people aligned with consumer interests. Furthermore, the defendants argue that board members of a community hospital could not act anti-competitively since they owe a fiduciary duty to the community, and hence consumers, to provide quality care at the lowest possible price. The defendants conclude that any attempt by management to implement anti-

competitive practices would be swiftly terminated by the boards.

The "consumer alignment" of the board is based merely on a survey of each board member's affiliations. The survey found that four out of five of the defendants' board members were affiliated with health purchasers as opposed to healthproviders. (Tr. 1183–84). There was, however, no further inquiry into each board member's loyalties. (Tr. 1404–06). Of course, the board's alignment with consumers is only important for anti-trust purposes if the alignment prevents the hospitals from taking anti-competitive action. One of the best ways to determine if the board will indeed rein in anti-competitive activity in the future is to examine their past actions in this regard. *See HCA,* 807 F.2d at 1388–89.

In 1983 and early 1984, the defendants colluded together and with St. Anthony to prevent Chicago Blue Cross from contracting with them to provide healthcare at a reimbursement level below the level in the defendants' previous contract with the defendant Rockford Blue Cross. The defendants contend that the collective response of the hospitals was merely a reaction to Chicago Blue Cross's request for a joint meeting with the hospitals concerning the negotiation of the new contracts. The defendants' fanciful argument, however, is crushed under the weight of documentary evidence, including minutes of the defendants' respective board meetings and letters back and forth between Chicago Blue Cross and the three Rockford hospitals. The minutes and letters are clear that the Rockford hospitals attempted to collectively boycott the signing of a Blue Cross contract in the hopes of gaining more money from Blue Cross. (*See* FF ¶ 131–134).

Neither the makeup of the defendants' board nor the non-profit status of the hospitals prevented the hospitals' managers from carrying out this anti-competitive activity. Reacting to market pressures, the hospitals' managers perceived the new Blue Cross reimbursement formula as a threat to their goals and chose to collude against Blue Cross despite the effect of

such collusion on healthcare consumers' premiums. (i.e. Blue Cross subscribers). *See North Dakota Hospital, supra.* Indeed, when questioned at trial as to his concern for Blue Cross subscribers, a hospital administrator retorted that they were the concern of the Blue Cross Board. (Tr. 1911). This overt example of past collusion in the relevant market is instructive in determining whether the defendants will hesitate to act anti-competitively in the future when their objectives diverge from the objectives of consumers. Indeed, the defendants' past conduct is one of the activities cited by this court as an anti-competitive act particularly suitable for the post-merger market.

Another telling indication of the defendants' anti-competitive tendencies is revealed through their attitudes toward the proposed merger itself. In particular, one of the original rationales used to justify the merger between RMH and SAH was the threat competition posed to the three Rockford hospitals' future viability.

In the following dialogue one of the defendants' hospital administrators relates the perceived threat competition poses to the future of the Rockford hospitals:

Q. Dr., if I could direct you to the current situation involving the merger of the two hospitals, and could you describe for the court your involvement in those discussions and what led up to it?

A. Well, there has never been a complete absence of conversations in this community about what the hospitals ought to be doing rather than fighting one another.

But five years or so ago, a concern of mine impacted with concerns of other people in very informal conversations, and it had to do with the prospect of health care in Rockford, the existence of three very fine hospitals that were always at one another's throat.... I began to think there are three organizations, that means three bottom lines and three chief executive officers who are hired by those corporations to

make certain that those three bottom lines remain viable.

Now the bottom line depends upon excesses of revenue or expenses.... and so, five years or so ago, what I found myself looking at was a situation where the aggregate budget for three hospitals ... $250,000,000 a year ... supported three open heart programs, three emergency rooms, three obstetrical units, three pediatric units, three administrators, three budgets for marketing and advertising and recruitment and malpractice.

.... it made sense ... to have more vigorous discussions about what could be done ... with the two remaining institutions to try and coalesce some of our resources and some of our services so that we could more effectively face the future.

(Tr. 1979–80).

While further explaining the historical underpinnings leading up to the decision to merge, the administrator recounted, with approval, several Rockford physicians' comments that: "[T]he best thing that could happen in Rockford, Illinois would be to reduce competition between the hospitals, to bring together some of the highly competitive clinical services, and begin to aim at consolidated kinds of staffing in the future." (Tr. 1985). Clearly, competition between the three hospitals was looked on as a threat to the three hospitals' existence.

Accordingly, the court finds that the defendants' "consumer-aligned" boards and not-for-profit status will not necessarily prevent the defendants from engaging in anti-competitive activity. Indeed, the court finds the relevant market's competitive nature and history of collusion are further indications that anti-competitive activity is likely in the relevant market.

Based on an examination of the relevant market's concentration, barriers to entry, nature of competition, and market participants, the court finds that the post-merger market is ripe for anti-competitive behavior.

*Opposition of St. Anthony's*

The defendants also contend that the vigorous opposition of St. Anthony Medical Center is further proof that the merger will not lessen competition. The defendants explain that if a dominant firm or cartel exercises market power the corresponding increase in market prices would benefit all the firms in the market; even non-colluding firms. The defendants argue that no logical competitor would contest a merger if the competition believed prices would increase in the market. The defendants conclude therefore that St. Anthony Medical Center must believe that prices will be lower in the post-merger market. In a response to a similar argument, the Seventh Circuit in *HCA* found that such opposition to the merger "is just one firm's opinion" not shared by the court. *HCA*, 807 F.2d at 1392.

Furthermore, as is true in the instant case, the Seventh Circuit noted that such an argument contradicts the defendants' earlier argument that non-profit hospitals "do not obey the laws of economic self-interest." *Id.* The defendants' interpretation of St. Anthony's motives may also be misplaced. St. Anthony's opposition to the merger may be not because it anticipates lower prices, but because it fears the economic power of the new entity would be exercised against it. In this same vein, St. Anthony did comment that the merger of SAH and RMH will make it more difficult to exclusively contract with preferred providers if the merged entity controls two hospital locations in Rockford and St. Anthony's only one location. (Tr. 531–32, 776, 793–95, 1061–63; GX 108, 110). In any event, the courts have consistently found that such opposition should not affect the outcome of a case such as this where the evidence, as is true in this case, supports the anti-competitive effect of the merger.

*Defenses*

The defendants respond that even if the merger has anti-competitive effects, any negative effects for consumers are outweighed by the benefits produced by the merger. The defendants justify the merger as a necessary and positive step for

consumers and the Rockford community on both a qualitative and quantitative level.

As to qualitative benefits to consumers, the defendants proclaim that the merger of SAH and RMH will provide the Rockford community with a first class regional tertiary referral center that will eventually rival tertiary referral centers in Madison, Chicago, Milwaukee and Rochester. The defendants promise that the number, depth, and quality of services at the hospital will improve. The merged entity, the defendants submit, will have the access to capital, resources and volume of patients necessary to allow for more specialized care, including organ transplants, a service not now performed in Rockford. The increased volume of various kinds of treatment at the hospitals will allow for better quality as expertise grows. The merging of the two hospitals will also reduce the unnecessary duplication of hospital services in the Rockford market. In turn, the defendants continue, the existence of such a high quality medical facility in Rockford will create the added benefit of spurring the economic development of the city as employers and businesses become aware of the hospital.

The defendants also offer the novel argument that the merger is necessary to insure the availability of high quality healthcare for consumers in the future. The defendants predict that the decline in inpatients and reimbursement levels in the relevant market will eventually be too great for the three hospitals to absorb. The defendants conclude that they have merely anticipated this eventuality and seek to avoid future financial failure by merging now.

As to the quantitative benefits for consumers, the defendants have fashioned a schedule incorporating a portion of the savings the merger represents to consumers of the defendants' services. The defendants have isolated four separate areas of savings arising from the merger and have projected the savings for a five year period. The first area of savings derives primarily from the elimination of duplicative services in "plant/program specializations." The

biggest savings in this area springs from the elimination of a separate Trauma I center at SwedishAmerican. Other savings come from the consolidation of the hospitals' pediatric intensive care, radiation oncology and laboratory/pathology programs. The second area of savings derives from the consolidation of nine separate overhead areas. The third area of savings, reduced insurance premiums, stems from the consolidation of insurance coverage for the two hospitals. The fourth and final area of savings comes from the standardization of the defendants' clinical practices through the sharing of a RMH efficiency program. According to the defendants, the total savings inuring to the benefit of the hospitals and eventually to consumers is $41,718,000. (Tr. 1579–82; DX 124).

With regard to the qualitative benefits created by the proposed merger, the court first acknowledges that the idea of a tertiary referral center in Rockford has great appeal. Undoubtedly, the improvement in services would have a positive effect for consumers of healthcare in the relevant market and economic benefits for the area as a whole. Unfortunately, the creation of a tertiary referral center, while a laudatory goal, is not relevant for our purposes today. The court's exclusive role is to evaluate the merger's effect on competition for the relevant market and no more. The *Philadelphia* court when faced with a similar issue delineated its approach as follows:

> We are clear, however, that a merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made for us already, by Congress, when it enacted the amended § 7. Congress determined to preserve our traditionally competitive economy. It therefore proscribed anti-competitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid.

*Philadelphia,* 374 U.S. at 371, 83 S.Ct. at 1745–46.

This statement of the Supreme Court is equally applicable in this case. The court finds the defendants' intention to create a state-of-the-art tertiary referral center and all its corresponding benefits in quality and community development as irrelevant for the present § 7 inquiry.

The defendants' second defense poses the question of whether a solvent corporation should be allowed to merge on the basis of its prediction of future financial calamity in this relevant market. Indeed, firms may successfully defeat a section 7 action on the basis of the firms' failure or inadequate resources. *See Brown Shoe,* 370 U.S. at 346, 82 S.Ct. at 1535. The defendants, in this case, however, are both solvent viable companies with current and projected fund surpluses.

The court finds that this "failing market" or "writing on the wall" defense too broad and ungainly to ward off a Section 7 violation. The speculative nature of the defense allows for too much abuse. How imminent must the market's disaster be? Can a firm merely propose future extinction and back it up with a five or ten year projection, fraught with assumptions? Already, in the case at bar, future shortfalls in fund balances have been readjusted upward to show a surplus. (Tr. 1500–62). Moreover, the trend of declining inpatients days feared for this relevant market has not materialized to the extent promised. (GX 76 at R 43723; GX 9 at 40319). The relevant acute inpatient hospital market may be failing but then again it may not. To allow an anti-competitive merger to occur on this basis is untenable.

The defendants' claim that the merger will eliminate unnecessary duplication of services may well be true to some extent. Nevertheless, consumers in the relevant area are already theoretically protected from unnecessary duplication by the CON law. *See American Medicorp, Inc. v. Humana,* 445 F.Supp. 589, 592–93 (E.D.Penn. 1977); (Tr. 425).

Next, under auspices of a very rigorous standard, the court approaches the defendants' quantitative efficiencies argument. In order for this to prove successful the defendants must establish by clear and convincing evidence that the efficiencies provided by the merger produce a significant economic benefit to consumers, even in light of the possible anti-competitive effects of the merger. *See* Department of Justice Guidelines, 49 Fed.Reg. 3.5.

The court would first note that with every merger or acquisition certain efficiencies and benefits will accrue. Otherwise, the merger probably would not have transpired in the first place, but because *competition, not competitors,* is protected under § 7, savings relevant for determining pro-competitive efficiencies must be made possible only through the merger and in no other manner. *See Brown Shoe,* 370 U.S. at 320, 83 S.Ct. at 1521; Department of Justice Merger Guidelines, 3.5. Efficiencies benefiting the merged entity, but obtainable by means independent of merger, are not relevant for § 7 purposes.

The court is initially suspicious of the defendants' savings schedule because of the relatively little attention placed on savings by the defendants in planning for and agreeing upon the merger. The formal study of efficiencies was hastily commenced well after the announcement of the merger. (Tr. 1568–78, 1681–82).

In any event, there are more substantive problems with the study. Perhaps the most glaring omission in the study is the lack of consideration for the expenses brought on by the proposed merger in the four areas specified in the study. Thus, the one-sided study projects the savings derived from the merger and none of the expenses. Realistically, some expenses will accrue in coordinating the various consolidations cited in the study, particularly in light of the fact that the two defendants' campuses are several miles apart. In short, the study does not reflect the net savings of the merger; only the cost savings. (Tr. 2066–67).

One potential problem with the defendants' "plant/program specialization" savings is with the 13 million dollar savings based on the elimination of SAH's Trauma

I center. (DX 124). Presently, SAH has no Trauma I center; however, the court is confident that SAH, as promised, will seek a Trauma I center if the merger is not consummated. (Tr. 1587–88, 1719–22, 2034–35). There is a substantial question, however, whether SAH will qualify for such a designation in light of past problems in securing the personnel necessary to qualify. (GX 105 at R 3584).

The defendants next designate over 12 million dollars in savings from the elimination of overhead in nine separate areas. (Tr. 1592; DX 124). Essentially, the savings stem from the elimination of personnel in the nine areas. The defendants assume that all the staff reductions can be made without a corresponding drop in production. (Tr. 1692–93). Naturally, in the context of a merger, some departments can be streamlined with little detrimental effect to production. For example, there is no need for two department heads for one consolidated department. Additionally, staffs of "competitive" departments such as Planning, Marketing and Public Relations and Human Resources may allow for reductions in light of the reduction in competition for patients and personnel caused by the merger. Yet, other areas such as medical records and janitorial services will most likely encounter no reduction in their workload due to the merger. A loss of staff here would undoubtedly stress the groups' production. (Tr. 2068–72). Some of the savings in these areas would occur not so much because of the economics effected by the merger, but from a drop in production.[21]

The court also questions the reliability of the cost savings obtained from lower umbrella insurance premiums for the merged entity. The defendants assert that their combined size creates an actuarial economy of scale that allows the merged entity's premium to be less than the sum of the two defendants' individual premium payments.

The proposed savings, however, may be created not only by the merged entities'

pooling of risk, but also by an increase in RMH's self-insurance. (Tr. 2078–2080). Presently, RMH pays more for insurance than SAH. One reason is that SAH has a higher deductible than RMH. After the merger, the merged entity could increase its deductible in order to receive a lower premium. Just as easily, RMH could individually raise its deductible in order to reduce its insurance premiums. (Tr. 1765–66). The defendants claim they cannot do this because they have a perinatal/neonatal unit that increases their exposure to liability. (Tr. 1767). The court notes that even after the merger this liability risk will remain, casting doubt as to whether all the cost savings can be attributed to economies of scale.

Finally, the last area of savings originates from the standardization of clinical practices. In essence, the defendants proffer that a considerable amount of savings (approximately 7 million dollars over five years) can be gained through a standardization program for clinical practices in the merged entity. In particular, through a consulting firm, RMH has initiated a standard step by step program to reduce costs and inefficiencies in a variety of clinical practices. Based on this program, the defendants calculated the difference in charges between corresponding practices at SAH and RMH and projected that the higher charges could be eliminated, thus saving the difference through a standardization program conducted after the merger.

The methodology employed by the defendants has been challenged by the government. The government complains that the defendants included "outliers" in their study, and that clinical practices with less than twelve observations were annualized. The government contends that this methodology skews the differences in charges between the hospitals upward thus overstating the potential savings.

The court, however, rejects most of the defendants' claimed savings for a much

---

**21.** Another aspect of the defendants' savings in the area of overhead that is troubling is the lack of information on the input/output relationship in the area of laboratory/pathology fees. Therefore, assumptions as to these savings are impossible to verify.

less technical reason; the standardization of clinical practices does not require a merger. Granted, the proposed merger will allow SAH to assimilate the standardization program of RMH but by this same token, there is nothing stopping SAH from individually hiring a consultant and implementing a program to standardize its practices. (Tr. 1604, 1732–37, 2090–91). The cost of consulting is the only true amount of money saved through the merger by such standardization, a one time sum of about $200,000 to $300,000 dollars. (Tr. 1732–37).

In sum, the defendants have demonstrated that the merger will generate some unique savings, but no more than normal and certainly not enough to override § 7 of the Clayton Act. Even if all the defendants' savings were verifiable and could only be achieved through merger, the amount saved pales in comparison to the likely amount of revenues generated by the defendants in the same five year period. (Tr. 2069). Moreover, monopoly rents could far outweigh the savings presented, particularly in light of the fact that much of the savings cited by the defendants were not clearly and convincingly generated by the merger. Large amounts of savings could be achieved independent of a merger through alternative action or a drop in production. Moreover, if costs related to the merger are taken into account, even more savings would be offset.

The court finds that the defendants have failed to clearly and convincingly demonstrate that the merger will, in fact, create a net economic benefit for the health care consumer.

## FINAL SUMMARY

■ This court is not unaware, nor unsympathetic with, the defendants' desire to improve their respective positions by establishing a new, more powerful economic entity. Certainly, viewing the proposed merger from the perspective of a purely business decision, the merger makes sense. It would allow the new entity to eliminate certain duplicative services and equipment, with the attendant reduction in personnel and other costs. It would improve the capital position of the new entity, as opposed to the old entities, thus allowing for greater expenditures for equipment and possibly improving the ability of the new entity to buy in larger quantities, reducing some costs. It might also allow the new entity to improve its services to the extent that it might become a major medical center, providing tertiary care in a wider range of services and in a broader geographical area. These are but a few of the business advantages which may inure to the benefit of the defendants if the merger is allowed to proceed. Others may also come to mind. In an anti-trust context, however, it is *competition*, not the *competitors*, which the laws seek to protect. *See Brown Shoe*, 370 U.S. at 320, 82 S.Ct. at 1521. If the court's task was motivated by the same business and economic considerations as those of the defendants, the inquiry could end here.

The inquiry of the court, however, is controlled by the precedental decisions of the Supreme and other courts, particularly the Seventh Circuit. When viewed in that context, this court feels compelled to grant the injunction. It is simply impossible to ignore the language in *Philadelphia, supra*, that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." The court then went on to say that, "The merger of the appellees will result in a single bank's controlling at least 30% of the ... *Philadelphia* metropolitan area. Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat. Further, whereas presently the two largest banks in the area control between them approximately 44% of the areas commercial banking business, the two largest after the merger will control 59%. Plainly, we think this increase of more than 33% in concentration must be regarded as signifi-

cant...." *Philadelphia,* supra, pp. 374 U.S. 321 at 363, 83 S.Ct. 1715 at 1741–1742. "There is nothing in the record of this case to rebut the inherently anticompetitive tendency manifested by these percentages." *Philadelphia, supra* pp. 374 U.S. 321 at 363, 367, 83 S.Ct. 1715 at 1741–1743.

This court, having first determined that the product market is acute inpatient hospital care and that the geographic market consists of Winnebago, most of Boone and Ogle and parts of McHenry and Stephenson counties, went on to calculate the percentage shares of the respective entities both before and after the merger.

Applying those percentage shares to the precise language contained in *Philadelphia,* the merger of the defendants here will result in a single hospital controlling almost 70% of the Winnebago, Ogle, Boone market. Without attempting to specify the smallest market share which would threaten undue concentration, it is clear that 70% presents that threat. Further, whereas the two largest hospitals in the geographic area control between them approximately 64% of the area's inpatient hospital business, the two largest after the merger will control 90%. This increase in concentration must be regarded as significant. Nor is there anything in the record of this case to rebut the inherently anticompetitive tendency manifested by these percentages.

As previously discussed, the merger is likely to hurt consumers, as by making it easier for the hospitals remaining in the market to collude, expressly or tacitly, and thereby force prices above or further above the competitive level. *HCA, supra,* p. 1386.

In sum, when analyzed in the context of the case law, and applying the facts of this case thereto, it is unescapable that the effect of the proposed merger of RMH and SAH would be to produce a hospital controlling an undue percentage share of the relevant market, and result in a significant increase in concentration of firms in the market, so as to be inherently likely to lessen competition substantially.

---

22. The court does not deem it necessary to reach the government's Sherman Act claim in

---

ORDER [22]

The court finds that the proposed merger of Rockford Memorial Corporation and SwedishAmerican Corporation is adjudged to be in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Both parties having agreed that they have had a full opportunity to investigate their respective claims, the parties have stipulated to consolidate the preliminary injunction hearing with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).

Accordingly, the court grants the permanent injunction prayed for by the United States. The defendants, Rockford Memorial Corporation and SwedishAmerican Corporation are hereby permanently enjoined from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to combine Rockford Memorial and SwedishAmerican Corporations. The defendants, and all persons acting on their behalf are permanently restrained from taking any action, either directly or indirectly, in furtherance of the proposed merger of Rockford Memorial and SwedishAmerican Corporations.

## APPENDIX

### FINDINGS OF FACT

The following findings of fact are not inclusive of all the court's findings of fact. The following findings of fact in conjunction with the findings in the court's opinion represent all the court's findings of fact.

1. The City of Rockford is located in Winnebago County in the northcentral part of Illinois. Winnebago County, together with the adjacent county to the east, Boone County, constitute the Rockford Metropolitan Statistical Area ("MSA"). According to 1980 U.S. Census data, the Rockford MSA had a population of 279,514, with Winnebago County accounting for 250,884 of that total. Rockford itself has a popula-

---

light of the court's finding of a Clayton Act violation.

tion of about 140,000 and covers an area of about 46 square miles. (Tr. 847).

2. Rockford has three relatively large general acute care hospitals. Listed in order of their size, as measured either by their number of state inventoried beds or staffed beds, they are: Rockford Memorial, SwedishAmerican, and St. Anthony Medical Center. (Tr. 115–16).

3. These three hospitals are located in different sections of Rockford: Rockford Memorial is located on the west side, SwedishAmerican is near downtown, and St. Anthony is on the east side. (Tr. 849).

4. Each of the three Rockford hospitals offers a full range of basic acute inpatient hospital services, as well as several "tertiary" services. (Tr. 116).

Hospitals are classified from most basic to most advanced as primary, secondary or tertiary facilities. Primary and secondary level hospitals generally provide basic 24 hour emergency room service, respiratory therapy, radiology/laboratory services, physical therapy, medical-surgical acute care, CT scanner, a vascular lab, operating suites, anesthesia services, nursery, obstetrics, and MRI. (Tr. 340–342). A tertiary level hospital has the same facilities as the other two levels and is available as a primary level hospital for the majority of its patients, but also has specialized services typically provided by leading hospitals such as lithotripsy, cardiovascular diagnostic lab, CT scanner, burn-care unit, and radiation therapy (cancer) services. (Tr. 240–41).

A referral hospital is one that because of the level of sophistication of its services is able to attract patients from smaller facilities having more limited services and capabilities. (Tr. 86, 89).

5. Some tertiary services, such as open heart surgery, are offered by all three Rockford hospitals, while others are offered only by one of the three. For example, St. Anthony is the only Rockford hospital to provide specialized burn services, SwedishAmerican has a well-known pediatric cardiology program, and Rockford Memorial has the only level three intensive care neonatal unit. (Tr. 116–17).

6. Taken together, the three Rockford hospitals offer a full range of inpatient hospital services, including tertiary services, except that they do not have some very specialized tertiary services, such as organ transplants. (Tr. 117). All three Rockford hospitals are well regarded health providers. (Tr. 129).

7. The defendant Rockford Memorial Corporation ("RMC") transacts business, maintains offices, and is found within the Northern District of Illinois. (Complaint at ¶ 2; Answer at ¶ 2).

8. RMC is a not-for-profit corporation organized and existing under the laws of the State of Illinois that maintains its principal office in Rockford, Illinois. RMC is engaged in a variety of health care related enterprises, including owning and operating Rockford Memorial Hospital ("Rockford Memorial" or "RMH"), which is a general acute care hospital in Rockford, Illinois. (Complaint at ¶ 7; Answer at ¶ 7).

9. The defendant SwedishAmerican Corporation ("SAC") transacts business, maintains offices, and is found within the Northern District of Illinois. (Complaint, ¶ 3; Answer, ¶ 3).

10. SAC is a not-for-profit corporation organized and existing under the laws of the State of Illinois that maintains its principal office in Rockford, Illinois. SAC is engaged in a variety of health care related enterprises, including owning and operating SwedishAmerican Hospital ("SwedishAmerican" or "SAH"), which is a general acute care hospital in Rockford, Illinois. (Complaint at ¶ 8; Answer at ¶ 8).

11. On September 29, 1987, Rockford Memorial Corporation and SwedishAmerican Corporation executed a Memorandum of Understanding, agreeing, in principle, to form a new not-for-profit corporation which would become the sole member of and control Rockford Memorial and SwedishAmerican, and all of their affiliated corporations including their respective principal subsidiaries, Rockford Memorial Hospital and SwedishAmerican Hospital.

12. Pursuant to the Hart–Scott–Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, Rockford Memorial and SwedishAmerican filed with the United States Department of Justice and the Federal Trade Commission notice of their intention to consolidate. These filings were made on November 25, 1987.

13. Following a review of the Hart–Scott–Rodino filings, and the other supplied documentation, the United States of America (the "government"), filed a verified complaint on June 1, 1988, to prevent and restrain the merger of Rockford Memorial and SwedishAmerican and to adjudge the transaction to be a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1.

14. The government simultaneously moved for a preliminary injunction to enjoin Rockford Memorial and SwedishAmerican from taking any action to proceed with the consolidation, originally scheduled to take place on June 1, 1988.

15. In a scheduling conference with the Court, prior to the actual filing of the complaint, Rockford Memorial and SwedishAmerican agreed voluntarily not to proceed with the consummation of the transaction until after such time as the Court could hear and rule on the government's motion for a preliminary injunction.

16. Prior to the commencement of the hearing, the parties conducted additional discovery, with each party serving interrogatories and a request for documents on the other party, and each party deposing potential and identified expert witnesses and certain other possible witnesses who were expected to testify at the hearing.

17. A preliminary injunction hearing was held beginning on June 20, 1988, and concluding on July 14, 1988, during which time the Court heard this matter for thirteen days, including the testimony of twenty-one witnesses.

18. Rockford Memorial Hospital is a not-for-profit, federally tax-exempt acute care community hospital. (Tr. 1436). It has 438 inventoried beds (and, in addition, 33 bassinets). Of these beds, 400 are set-up and staffed. Approximately seventy-five percent, or 300 of the set-up and staffed beds, are filled with patients on a daily basis. (Tr. 1467).

For its fiscal year ended February 28, 1987, Rockford Memorial had income from operations of $4.2 million on $73.5 million in net revenues; it had $2.8 million in non-operating revenues; and it had an overall excess of revenues over expenses of $7 million. (GX 76 at R43723).

According to projections presented to its board of trustees on February 19, 1988, for its fiscal year ending February 29, 1988, Rockford Memorial had an income from operations of $8.4 million on $85.9 million in net revenues; it had $3.8 million in non-operating revenues; and it had an excess of revenues over expenses of $12.1 million. (GX 76 at R43723).

19. The total number of inpatient days of care delivered by Rockford Memorial declined from 110,671 in fiscal year 1984, to 107,020 in fiscal year 1985, to 99,789 in fiscal year 1986. The total then increased to 101,458 in fiscal year 1987, and to a projected 107,104 in fiscal year 1988; this total is expected to increase further, to 108,400, in fiscal year 1989. (GX 76 at R43723).

20. For its fiscal year ended February 28, 1987, Rockford Memorial had total assets of $77.3 million and an excess of total assets over total liabilities ("fund balance") of $52 million. (GX 76 at R43724).

21. According to projections presented to its board of trustees on February 19, 1988, for its fiscal year ending February 29, 1988, Rockford Memorial had total assets of $90.5 million and a fund balance of $60.7 million. (GX 76 at R43724).

22. Rockford Memorial's fund balance was projected to be $8.6 million more at the end of its fiscal year 1988 than it was at the end of its fiscal year 1987. (GX 76 at R43724).

23. Rockford Memorial's fund balance does not reflect the sums of money that it has from time to time transferred to other RMC affiliates. (Tr. 1534–35). In fiscal

year 1988, Rockford Memorial transferred a projected $3.8 million to RMC affiliates; in fiscal year 1987, it transferred $5.7 million to RMC affiliates; and during fiscal years' 1984–1986, it transferred another $5.2 million to RMC affiliates. (GX 76 at R43725).

24. Approximately thirty-five percent of Rockford Memorial Hospital's revenue is for services provided to Medicare recipients, fifteen percent for Medicaid recipients, six percent for enrollees in Clinicare, a health maintenance organization, and six percent for Blue Cross; other payers accounted for the final third of Rockford Memorial Hospital's payer mix. (Tr. 1454). For fiscal year 1988, Rockford Memorial Hospital had $3.2 million in charity care, including bad debt. (Tr. 1454). In addition, Rockford Memorial Hospital, like SwedishAmerican Hospital, is often reimbursed less than its charges from certain payers, with Medicaid paying only forty-six percent of the charges for services. (Tr. 1455). Medicare also often pays hospitals less than their charges. (Tr. 1019). Rockford Memorial Hospital employs approximately 1,500 employees on a "full time equivalent" basis and has a medical staff of approximately 386, with 150 physicians on the active medical staff. (Tr. 1436, 1467).

25. SwedishAmerican Hospital is also a not-for-profit, federally tax-exempt acute care hospital, organized for charitable, educational and medical purposes. (Tr. 1972). SwedishAmerican Hospital has 427 inventoried hospital beds; 363 beds are currently set-up and staffed, with 66 percent, or 240 beds filled with patients on a daily basis. (Tr. 1972).

26. For its fiscal year ending May 31, 1987, SAC had an income from operations of $1 million on $74.4 million in net revenues; it had $1.3 million in nonoperating revenues; and it had an overall excess of revenues over expenses of $2.4 million. (GX 27 at 5).

27. SAC had total assets of $65.6 million and a fund balance of $43.5 million as of September 30, 1987. (GX 28).

28. SAC's fund balance was $2.4 million more at the end of its fiscal year 1987 than it was at the end of its fiscal year 1986. (GX 27 at 4).

29. SwedishAmerican has a total medical staff of more than 400 doctors, of whom almost 200 (including 12 dentists) have active staff privileges; the remainder of the doctors with privileges at Swedish-American have courtesy staff privileges, since they maintain active privileges at one of the other Rockford hospitals. (Tr. 1972).

30. In 1985, SwedishAmerican had 13,-185 patient admissions and provided 88,977 days of inpatient care. (DX 42 at 2).

31. The third hospital in Rockford, Illinois is Saint Anthony Medical Center ("Saint Anthony" also "STA"), a general acute care facility with an inventoried bed capacity of 303 beds, operating with available beds of 258 in 1987. (Tr. 511). Of those beds, approximately 62 percent are filled with patients on a daily basis. (Tr. 512).

32. For fiscal year 1987, Saint Anthony had $48 million in gross revenues. (Tr. 512). Of those revenues, eighty to eighty-five percent were accounted for by Saint Anthony's inpatient services. (Tr. 512).

33. In 1985 St. Anthony had 9,017 patient admissions and provided 50,274 days of inpatient care. (DX 42 at 2). For its fiscal year ending September 30, 1987, St. Anthony had about 9,000 patient admissions and provided about 58,500 days of inpatient care. (Tr. 512).

34. Saint Anthony is owned by the Sisters of the Third Order of St. Francis (the "Third Order"), a religious congregation with a mission in health care. (Tr. 561). The Third Order owns eight health care facilities, seven hospitals and one nursing home. In addition to Saint Anthony, those facilities include St. Joseph's Hospital Medical Center in Bloomington, Illinois; St. Mary's Hospital in Galesburg, Illinois; Saint James Hospital in Pontiac, Illinois; St. Francis Hospital in Escanaba, Michigan; Saint Francis Medical Center in Peoria, Illinois; St. Joseph's Hospital in Belvidere, Illinois; and St. Francis Continuing Care Facility in Burlington, Iowa. (Tr. 561–562).

Combining all facilities, the Third Order has approximately 1,400 beds available for treating patients. (Tr. 566).

35. Rockford Memorial and Swedish-American regularly purchase substantial quantities of equipment and supplies from sources outside of Illinois for use in connection with their provision of acute inpatient hospital services in the Rockford area. Rockford Memorial and SwedishAmerican regularly receive substantial revenues from governmental and private payers located outside Illinois in payment for acute inpatient hospital services provided by their hospitals in the Rockford area. (Complaint at ¶ 18; Answer at ¶ 18). For example, the funds that the State of Illinois pays to Rockford Memorial and SwedishAmerican are derived fifty percent from state tax revenues and fifty percent from revenues paid out of the federal treasury. (Tr. 272–73).

36. Rockford Memorial and Swedish-American are each engaged in interstate commerce and their activities are in the flow of, and substantially affect, interstate commerce. (Complaint at ¶ 18; Answer at ¶ 18).

37. A third-party payer is an individual or group that pays for health care services on behalf of the consumer. (Tr. 124).

38. The major third-party payers in Rockford are Medicare, traditional indemnity insurers, self-insured employers, Medicaid and Health Maintenance Organizations ("HMO"). (Tr. 134–35).

39. Many Rockford industries are self-insured and run their own employee health benefit plans. (Tr. 125–26).

40. Recently, there have been major advances in medical technology including diagnostic and therapeutic equipment, medications, anesthetics, surgical techniques, monitoring systems, and other medical equipment. These advances have made it possible for services which were once appropriately and safely performed only on an outpatient basis to be performed on an outpatient basis—in outpatient clinics, surgery centers and doctors' offices. (Tr. 44–45; 1617).

41. In addition, there are certain medical conditions for which a medically appropriate non-surgical outpatient procedure may be employed in lieu of the traditional inpatient surgical procedure. One example is the treatment of kidney stones. Kidney stones may be treated on an outpatient basis, through the use of lithotripsy, or on an inpatient basis, through traditional kidney stone surgery. Physical diagnosis generally is another example. Today, computerized tomography ("CT") scanning and magnetic resonance imaging ("MRI"), performed on an outpatient basis, have supplanted traditional exploratory surgery, performed on an inpatient basis. (Tr. 1619–21; 1627).

42. The advent of non-invasive outpatient substitute treatments, such as CT scanning, MRI and lithotripsy, suggests that purchasers of medical care have and will continue to seek less costly outpatient treatment for an expanding range of medical conditions. (Tr. 1636–39).

43. For example, four to five years ago hernia and cataract operations were performed on an inpatient basis almost exclusively; in more recent years, however, hernia and cataract operations are performed almost exclusively on an outpatient basis. (Tr. 1634–35).

44. Certain services and procedures are, for the first time, beginning to be performed on an outpatient basis. Examples include laser surgery and cardiac catheterization, and the use of alternative birthing centers for child birth. (Tr. 1620–22).

45. A number of medical procedures are today within a "gray zone", in that they may be performed on either an inpatient or an outpatient basis, including at the home. These procedures include, but are not limited to, chemotherapy, antibiotic intravenous procedures, and the use of bilirubin ultraviolet lights to perform liver functions in premature infants. In determining whether patients requiring these procedures may be treated on an inpatient or an outpatient basis, doctors must evaluate whether and to what extent a particular patient will be

capable of self-treatment at home, or can safely and effectively be treated on an ambulatory basis at a clinic or in a hospital outpatient department. If the physician determines that the patient may be treated as an outpatient, the physician will usually prescribe or the third party payer will require the less costly outpatient treatment as a substitute for inpatient treatment. (Tr. 1633–36).

46. There are certain medical procedures for which third party health care payers will reimburse hospitals only if the particular procedure is performed on an outpatient basis, unless some specific medical condition requires inpatient admission. The number of the procedures on payers' mandatory outpatient lists has increased in recent years, as has the volume of these services. (Tr. 1633).

47. In conjunction with these lists of mandatory outpatient procedures, many private third party payers require pre-admission certification. These third party payers—or self-insured employers—require that their subscribers obtain a second opinion confirming the appropriateness of inpatient care for the treatment of the patient's diagnosis. After evaluating the patient, the third party payer may conclude that a course of outpatient treatment is an appropriate and less costly substitute for inpatient treatment. (Tr. 46; 1616–19). Accordingly, the third party payer will refuse to reimburse hospitals for those charges rendered in connection with uncertified patients. (Tr. 127–28; 278–79; 522–23; 1616–17, 1770, 1774–75).

48. Payers also conduct concurrent and post-discharge utilization review. Concurrent review is the process by which current inpatients are evaluated by health professionals retained by third party or self-insured payers to determine when the patient should be discharged and treated as an outpatient. Post-discharge utilization review is a process used by Medicare, Medicaid, and some private payers to evaluate retrospectively the propriety of admission and decide whether or to what extent to reimburse hospitals. (Tr. 41–42; 1616–19).

49. Concurrent review and post-discharge utilization review by third party or self-insured payers have the same basic objective as pre-admission certification: to contain health care costs by encouraging the substitution of outpatient treatment for inpatient treatment. (Tr. 1619–22).

50. Third party payers have responded to the increased cost of inpatient treatment by attempting to shift their subscribers from inpatient to outpatient treatment for a wide range of ailments and conditions. (Tr. 1633).

51. These efforts by third-party payers largely began about 1984, following changes in Medicare reimbursement methodologies that also sought to encourage use of outpatient services. Hospitals have been responding to the efforts of governmental and private third-party payers to encourage use of outpatient services for the past several years. (Tr. 1769–70).

52. For conditions which may be treated identically on either an inpatient or an outpatient basis, purchasers of health care services are extremely price-sensitive; an increase in the cost of the room rate component of inpatient charges often leads to an increased shift to outpatient treatment. (Tr. 1633).

53. As a result of such utilization review programs, patients hospitalized today tend to have more severe and complex conditions and to require more hospital resources for treatment than patients hospitalized in the past. (Tr. 127–28; 522; 1773–74).

54. Pursuant to implementation of utilization review procedures, if a third-party payer determines that a patient's use of inpatient hospital services was not medically necessary, the third-party payer may refuse to pay for the patient's use of such services. (Tr. 46; 522).

55. For patients who are hospitalized today, outpatient services are usually not a good substitute for the hospital services that are provided only by acute care hospi-

tals on an inpatient basis. (Tr. 123–24, 188; 278–79; 375; 903).

56. General acute care hospitals provide a combination of acute inpatient hospital services for patients who require at least overnight hospitalization for the diagnosis or treatment of an illness or medical condition. (Tr. 121).

57. A physician admits a patient to a general acute care hospital after making the judgment that the treatment of a patient's illness or medical condition cannot be accomplished through the use of outpatient services. (Tr. 43, 63). Essentially, a patient's admission to an acute care hospital rests upon "a determination that that patient requires inpatient care and the technology and the support services and the professional care that's associated with that inpatient care." (Tr. 522).

58. Rockford Memorial Hospital and SwedishAmerican Hospital provide extensive outpatient services; those services include, among others, outpatient surgery, gastroenterology, rehabilitation, physical, speech and occupational therapy, renal dialysis, cardiac rehabilitation, laboratory services, radiology, diagnostic imaging, radiation oncology and substance abuse treatment. (Tr. 1613).

59. The trend among hospitals is that the provision of outpatient services will continue to grow in coming years, based on new medical technology, new advances in medications and increasing payer pressures to reduce health care costs. (Tr. 45, 252, 1619).

60. In the Rockford area, there are numerous nonhospital health care providers. DX 132, "Rockford Area Nonhospital Competitors," identified approximately fifty radiology, physical therapy, laboratory, and chemical dependency non-hospital health care providers in the Rockford area. (Tr. 1627–28).

61. There are a number of urgent care centers and walk-in clinics in the Rockford area. There are no formal freestanding outpatient ambulatory surgery centers in Rockford; however, for certain surgical procedures, particularly plastic surgery, much of that work is currently being performed in doctors' offices in quasi-surgical suites. (Tr. 1628).

62. Additionally, laboratory work and electrocardiograms ("EKGs") are performed on an outpatient basis in hospitals, in state-licensed clinical laboratories located within physicians' offices, and in freestanding outpatient clinics. (Tr. 1623).

63. Physician practice groups, as well as clinics, hospitals and other health service providers, are currently expanding their services to increase their revenue, as pressure from Medicare and other third party payers increases. (Tr. 1624).

64. Outpatient services in health care hospitals are performed by exactly the same doctors, nurses and technicians, using the identical equipment, and employing the identical facilities as inpatient services. (Tr. 1622).

65. Outpatients often later become inpatients at hospitals, whether later in the day on which they receive outpatient treatment, or later in the course of their outpatient treatment. For example, if an outpatient diagnostic test is performed at a hospital and a condition is identified that requires surgery or other inpatient treatment, the outpatient will often be admitted as an inpatient at that hospital. Conversely, inpatients often return for outpatient follow-up treatment. (Tr. 1623).

66. Presently and in the foreseeable future, however, there are limitations, from a medical perspective, upon the types of patients and the types of illnesses and medical conditions that can be treated appropriately through outpatient services. (Tr. 45, 374–75). There are patients that require services and monitoring that are too intensive to be done on an outpatient basis; in addition, for certain types of procedures, especially surgical ones, some inpatient hospital care is necessary after the procedure is performed, so that they cannot be performed appropriately on an outpatient basis. (Tr. 44).

67. The Illinois Department of Public Aid purchases most of its inpatient hospital services under a competitive contracting

program, "ICARE," and it could not use for most patients outpatient providers as a substitute for its acute inpatient hospital service needs. (Tr. 278–79). In addition, the contracts that third-party payers enter into with SwedishAmerican contain different pricing terms for inpatient versus outpatient services. (GX 26).

68. Physicians play a substantial role in determining where their patients are hospitalized. (Tr. 43, 85, 130, 234–35, 517).

69. In order to reduce time spent traveling between their offices and hospitals to visit patients and participate in meetings, physicians prefer to admit patients to hospitals that are conveniently located to their offices. (Tr. 47–48, 517–18, 759).

70. Patients also prefer to be admitted to hospitals that are located close to their homes or places of business. (Tr. 517). This facilitates the ability of family and friends to visit. (Tr. 759, 1271–72, 1800–01).

71. Most physicians with offices in Rockford have admitting privileges at one or more of the Rockford hospitals and almost always admit their patients to the Rockford hospitals. (Tr. 48–49, 52, 131, 517, 1082).

72. Physicians with offices in Rockford do not, with a few exceptions, have admitting privileges at hospitals located outside of Rockford. (Tr. 50, 52, 131, 517, 761–62, 131, 1268). They do not have such privileges because traveling to these hospitals is inconvenient; and Rockford residents prefer to be admitted to one of the Rockford hospitals when they require hospitalization. (Tr. 49–51, 517–18).

73. Residents of the Rockford area that wish to be admitted to hospitals outside the Rockford area would likely have to be admitted by a non-Rockford area physician. (Tr. 1268–71).

74. The strong preference of the Rockford area's consumers and physicians for the local Rockford hospitals is also attributable in part to their perception that the acute care hospitals within a one-hour drive of Rockford, but outside the Rockford area, do not provide as wide a range of services and do not have on their medical staffs the specialists needed to provide the more sophisticated services that the Rockford hospitals provide. (Tr. 759–65, 2015–16).

75. Purchasers of health care services include third party payers such as Medicare, Medicaid, private insurance companies, health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and self-insured employers, as well as the patient's physician who determines the types of medical services a patient is to receive and refers patients to the facility where such care will be delivered. (Tr. 46–47, 751).

76. A Preferred Provider Organization ("PPO") is an arrangement under which a third-party payer contracts with selected health care providers, including hospitals, on favorable pricing terms and then provides its insureds with incentives to use those selected providers when they need health care services. (Tr. 126).

77. Families or individuals who are members of a Health Maintenance Organization pay a prepaid amount for health care regardless of which services they require. (Tr. 125).

78. PPOs and HMOs seek discounts from a health care provider in return for a promise to send their patients to the provider. This produces lower costs for consumers and helps providers fill empty beds. (Tr. 126, 139–40, 530).

79. HMOs and PPOs will grow in the future in Rockford. (Tr. 139–40; 529–30; 748–49; GX 5 at R34445; GX 6 at R515; GX 77 at R3399).

80. Employers and insurers do not believe that it would be feasible to require their employees or insureds living in the Rockford area to utilize hospitals outside that area. (Tr. 764).

81. There are two general acute care hospitals located in Belvidere, Illinois, which is east of Rockford. (Tr. 49, 118, 514, 759). Highland Hospital has 70 state inventoried beds and is operated pursuant to a management contract with Swedish-American. St. Joseph's Hospital has 100

state inventoried beds and is owned by the Sisters of the Third Order of St. Francis, also the owner of St. Anthony. (Tr. 119–120; Tr. 1653–55; GX 31).

Highland has the following referral agreements: perinatal with RMH, but has recently discontinued obstetric service; pediatric intensive care with SAH. (Tr. 1654).

St. Joseph's Hospital has the following referral agreements: pediatric intensive care with SAH and burn agreement with St. Anthony.

82. Beloit is located on the Illinois Wisconsin border approximately 20 miles north of Rockford. Its metropolitan population is approximately 35,000. (city and township) (Tr. 372). Beloit Memorial Hospital is a general acute care hospital located in Beloit, Wisconsin with 256 beds. It currently has 150 beds staffed. Beloit is approximately 20 miles north of Rockford. It takes approximately 25 minutes to drive from downtown Rockford to Beloit Memorial Hospital. (Tr. 371–72).

83. Beloit Memorial provides a full range of primary and secondary services and cardiac catherization but does not provide the wide range of services available at the Rockford hospitals. (Tr. 372, 761).

84. There is very little physician overlap between Rockford and Beloit. No Rockford physicians have attending staff privileges at Beloit Memorial. One physician, a (active) radiation oncologist, with an office in Rockford has consulting staff privileges at the Beloit hospital. This physician sees patients on an outpatient basis only. (Tr. 378–79, 761). The tertiary services received in Rockford are unavailable at Beloit (except for cardiac catherization) (Tr. 383). As part of a PPO, marketed to employers, Beloit has tertiary referral agreements with the University of Wisconsin at Madison and SwedishAmerican. The patients referred to Rockford, for the most part, are from the southern part of Beloit and South Beloit. (Tr. 382, 1641). Beloit also has a radiation oncology referral agreement with RMH. (Tr. 1644).

85. One of the reasons for the affiliation with the University of Wisconsin Hospitals by Beloit Memorial Hospital was to reverse a pattern of having patients who were referred to the Rockford hospitals for tertiary care also elect to go to the Rockford hospitals for primary and secondary care in the future. (Tr. 419–420).

86. Approximately 5% of Beloit Memorial's total patient admission comes from the Rockton/Roscoe area of Winnebago County, 85% come from the Beloit and South Beloit area. (Tr. 379).

87. Beloit Memorial does not offer the range of services that are available at the Rockford hospitals and use of this hospital would require establishing a relationship with a physician outside of Rockford. (Tr. 761–62).

88. Freeport Memorial Hospital is located in the city of Freeport, in Stephenson County, Illinois. It has 274 state inventoried beds including 24 skilled nursing beds; 180 beds are staffed. It takes approximately 40 minutes to drive from Freeport to Rockford. It is about 30 miles west of Rockford. The approximate population of Freeport is 27,000. (Tr. 224–27).

89. Freeport Memorial is a not-for-profit acute care hospital that offers primary and secondary services and tertiary services to a small extent. It is unlikely that Freeport will offer greater tertiary care services in the future because it does not have the population in its service area to support the provision of highly sophisticated services. (Tr. 226–27, 236, 240).

90. No members of Freeport Memorial's active medical staff have offices in Winnebago County. (Tr. 231).

91. Freeport Memorial utilizes once a month a mobile lithotripsy unit pursuant to an agreement with the Third Order of St. Francis. (Tr. 227).

92. Freeport Memorial averages an occupancy rate of around 60 to 65 percent of staffed beds, with a recent trend toward more utilization. (Tr. 228).

93. Freeport Memorial Hospital's chief executive officer, Dennis Hamilton, considers his primary service area to be Stephen-

son County and the border counties of Jo Daviess, Carroll and Ogle County to be a secondary service area. (Tr. 232).

94. Freeport Memorial does not market its services to Rockford employers because it is unlikely that residents of Rockford would leave the local area to go to a smaller community hospital. (Tr. 237–38; PFF 114–16).

95. About 2% of Freeport Memorial Hospital's patients originate in Winnebago County. These patients live in the far western border area. (Tr. 233).

96. According to CEO Hamilton, of the 25% of Freeport residents that seek care outside Freeport, the patients travel in equal proportion to Madison, Monroe, and Rockford hospitals. (Tr. 235). These patients leave Freeport for a variety of reasons including: lack of specific services in Freeport, perception bigger is better, referral patterns, and a historical image problem of Freeport Memorial. (Tr. 235).

97. Freeport Memorial is involved in several referral agreements including the following: perinatalogy renal dialysis, neurosurgery transport with RMH; emergency transfers with both RMH and SAH: some involvment with SAH with cardiac service transfers; pediatric intensive care with SAH; burn care and neurosurgery trauma transport with STA; transfer agreement including oncology with the University of Wisconsin. (Tr. 236–37, 1641–42).

98. Kishwaukee Community Hospital is in the city of Dekalb, Dekalb County, Illinois. It is approximately 40 miles from St. Anthony Medical Center or a 45–60 minutes drive from Rockford. The city of Dekalb has a population of approximately 33,000. (Tr. 76, 78).

99. Kishwaukee is a not-for-profit short term acute hospital with 164 state inventoried beds; only 132 beds are staffed. (Tr. 78).

100. Kishwaukee is operating at about 50 to 55 percent capacity. Kishwaukee provides medical-surgical, pediatrics, intensive care, psychiatric and chemical depend-

ency, and obstetrics and outpatient services including: x-ray, day surgery, ultrasound, pediatric cardiology, epilepsy clinic and emergency room service. (Tr. 79).

101. According to Kishwaukee Community's president, Wayne Fesler, Kishwaukee's primary service area is within a ten to fifteen mile radius of the hospital, with a secondary service area extending another 5 to 10 miles. (Tr. 93).

102. Eighty-five percent of the residents in the primary service area are hospitalized at Kishwaukee. The primary reason being their relationship with their physician. (Tr. 85–95).

103. According to President Fesler, Kishwaukee does compete in the northern part of Dekalb County. (Tr. 101).

104. According to Mr. Fesler, the reason the 7 to 10% of residents in Kishwaukee's primary service area are hospitalized in Rockford include: subspecialties are present in Rockford (ie. neurosurgery, bypass surgery, radiation oncology, perinatal, neonatal, gastroenterology). (Tr. 96).

105. Kishwaukee has not attempted to market services to insurers to have them direct their plan beneficiaries that reside in Rockford to Kishwaukee. (Tr. 87).

106. Kishwaukee does not market its services in Rockford because the residents of this area have existing relationships with Rockford physicians. (Tr. 87–88).

107. Kishwaukee has referral agreements with the 3 Rockford hospitals and Chicago-area hospitals including the following: trauma patients to both RMH and SAH, spinal cord patients to Northwestern, limb reimplantation to the University of Chicago and Loyola. (Tr. 94–95, 1656).

108. Memorial Hospital in the city of Woodstock, McHenry County, Illinois, has 142 state inventoried beds; only 126 beds are staffed. It is located approximately 46 miles east of Rockford. (Tr. 325, 327).

109. Hospital Corporation of America manages Memorial Hospital pursuant to a management agreement (Tr. 326).

110. Woodstock contains approximately 12,000 people (Tr. 327). Average daily limitation of capacity of Memorial Hospital for

the fiscal year ending September 30, 1987 was approximately 64%. (Tr. 327).

111. Memorial Hospital provides primary and secondary services. It does not offer tertiary care type services and will not offer these services in the future. It does not have the financial resources to compete with the major tertiary hospitals in the provision of these types of services. (Tr. 329–30, 41).

112. Some of the services provided by Memorial include: cardiac catheterization, renal dialysis, emergency services, radiology lab, physical therapy, general support service. (Tr. 329).

113. Insurers have never approached Memorial to service Rockford inpatients who are insured. Nor has Woodstock marketed its service in Winnebago County but it has marketed in Marengo (a point halfway between Woodstock and Rockford). (Tr. 333).

114. According to Memorial Hospital's chief executive officer, Phillip Dionne, it would be unrealistic for Memorial to market in Winnebago County because of little physician overlap and large travel time. (Tr. 333–337).

115. Memorial has a prenatal referral agreement with Rockford Memorial and will have a referral with Lutheran General in Chicago for emergency transfers. (Tr. 338–39).

116. Physicians with offices in Winnebago County do not have active or associate privileges at Memorial Hospital. A few have courtesy or consulting privileges but do not admit patients to the hospital and are called in as specialists to consult with Memorial's attending staff members. (Tr. 332).

117. Sycamore Hospital is located in Dekalb County and has 49 state inventoried beds. (Tr. 1655; GX 31). This hospital is on the verge of going out of the general acute care business. It serves mainly ventilator dependent patients. Rockford Memorial has an agreement to transfer long term chronic patients to Sycamore. (Tr. 1655–56).

118. Other hospitals located in northern Illinois and southern Wisconsin include the following:

| Hospital | City | County | State Inventoried Acute Care Beds |
| --- | --- | --- | --- |
| Community General | Sterling | Whiteside | 117 |
| Galena–Strauss | Galena | Jo Daviess | 29 |
| Harvard Community | Harvard | McHenry | 36 |
| Katherine Shaw Bethea | Dixon | Lee | 155 |
| Morrison Community | Morrison | Whiteside | 48 |
| Northern Illinois Medical | McHenry | McHenry | 171 |
| Rochelle Community | Rochelle | Ogle | 62 |
| Sandwich Community | Sandwich | Dekalb | 93 |
| Savannah City | Savannah | Carroll | 37 |
| Mercy | Janesville | Rock | – |
| St. Clare | Monroe | Green | – |

Totals for state inventoried acute care beds exclude beds devoted to long term care, rehabilitation, substance abuse and psychiatric services. (GX 31; GX 39; Tr. 1643, 1656, 1661–2).

119. Other referral agreements between Rockford hospitals and these outlying hospitals include:

Harvard Community has the following referral agreements with Rockford Memorial: perinatal agreement with Harvard; pediatric intensive care unit and cardiac monitoring with SwedishAmerican, and burn care with St. Anthony. (Tr. 1650–51).

Northern Illinois Medical Center has the following referral agreements: perinatal

and cardiac catheterization, helicopter transport transfer agreement with Rockford Memorial, burn care agreement with St. Anthony, trauma transfer with both STA and RMH. (Tr. 1652–53).

Rochelle has the following referral agreements:

Neonatal/perinatal transfer agreement with RMH; pediatric intensive care unit and cardiac monitoring with SAH: and burn agreement with St. Anthony; and recruitment agreement with University of Illinois College of Medicine. (Tr. 1657).

Katherine Shaw Bethea has the following referral agreements:

Perinatal, rehabilitation, and renal dialysis with RMH; pediatric intensive care with SAH; neurosurgery and trauma transfer agreement with RMH and STA. Radiation oncologist for RMH travels to Katherine Shaw Bethea. (Tr. 1657–58).

120. Approximately twenty-five to thirty percent of the patients actually utilizing the Rockford hospitals come to these hospitals from beyond the government's proposed geographic market. (GX 8).

Most of these patients come to Rockford to receive services that are not available at the hospitals closest to them and others because they believe that the Rockford hospitals provide higher quality. Tr. 86; Tr. 130; 519, 764–5, 944, 1253, 1271, DX 112).

121. Dr. Lynk based his opinion that the geographic market consisted of the ten counties surrounding the Rockford hospitals on an analysis of patient origin and destination data. These data were compiled by the Illinois Hospital Association, which is an association that includes virtually all of the hospitals in Illinois (Tr. 1005), and by the Health Care Financing Administration, which administers the Medicare payment process (the "MedPar" data). (Tr. 1110).

### Elzinga–Hogarty Results—Charges

The following figures were calculated using the charge data in DX 104:

| Counties | LOFI | LIFO | AVERAGE |
|---|---|---|---|
| W | 67.2% | 87.9% | 77.6% |
| W, B | 72.6% | 88.7% | 80.6% |
| W, O, B | 79% | 85% | 82% |

| Counties | LOFI | LIFO | AVERAGE |
|---|---|---|---|
| W, O, B, D | 83% | 80% | 81.5% |
| W, O, B, Mc | 82% | 75% | 78.5% |
| W, B, O, R | 82.7% | 81.5% | 81.9% |
| W, O, B, Mc, D | 85% | 75% | 80% |
| W, B, O, R, S | 84.2% | 82.2% | 82.1% |
| W, B, O, R, S, D | 86.8% | 81.4% | 83.1% |
| W, B, O, S, Mc, D | 86% | 76% | 81% |
| W, R, O, R, S, D, MC | 87.6% | 75.5% | 81.5% |
| W, B, O, S, Mc, D, L | 88% | 77% | 82.5% |
| Other 3 counties | 1.4% | 2% | |
| Ten County Area | 90% | 74.7% | 82.4% |

123. In a 1985 CON application for an MRI, Saint Anthony stated it served the entire state designated Region I–A planning area. (DX 55) (Tr. 615.) This is an area consisting of the following Illinois counties: Winnebago, Boone, DeKalb, Ogle, Dixon, Whiteside, Carroll, Jo Daviess and Stephenson. (DX 70.) Moreover, Saint Anthony stated it not only served the state planning area but it also is a regional referral center. (Tr. 615.) Similarly, in another CON application for a mobile lithotripter, Saint Anthony stated that it expected to extend services to southern Wisconsin. (DX 60).

124. Mr. Rindler's testimony that his hospital does not compete with the Rockford hospitals is somewhat contradicted in an earlier book he authored where he described the following:

Beloit's hospital out-migration numbers made it clear that most local residents leaving the community for health care were going to one of three tertiary hospitals in a nearby northern Illinois city. Families tended to utilize the tertiary hospitals for primary care because they perceived the quality of care was better.

(DX 134, Tr. 1648–49).

125. To the extent that patients are coming to Rockford for tertiary care, their economic importance to the hospital is greater than their numbers alone might indicate. (Tr. 1678).

126. The pre-merger HHI for the market for the provision of inpatient staffed beds is 2555, and it will increase approximately 2048 to 4603 as a result of the proposed merger. The number of general acute hospitals will decrease from six to five with one hospital constituting 64% of the hospital beds.

Taking into account the affiliations of SAH with Highland and St. Anthony's with

St. Joseph's; the pre-merger HHI for the market for the provision of inpatient staffed beds is 3184, and it will increase approximately 2464 to 5648 as a result of the merger. The number of general acute hospitals will decrease from 4 to 3 with one hospital (the merged entity) controlling 70.4% of the staffed inpatient hospital beds.

The per-merger HHI for the market for the provision of inpatient days is 3026, and it will increase approximately 2621 to 5647 as a result of the proposed merger. Taking into account the affiliation of SAH and Highland and STA with St. Joseph's, the pre-merger HHI for the market for the provision of inpatient days is 3331, and it will increase approximately 2836 to 6167 as a result of the mergers.

The pre-merger HHI for the market for the provision of inpatient admissions is 2789, and it will increase 2322 to 5111 as a result of the merger. Taking into account the affiliation of SAH and Highland and STA and St. Joseph's, the pre-merger HHI for the market for the provision of inpatient admissions is 3200, and it will increase 2774 to 5770.

127. In conjunction with the CON program, the Illinois Health Facilities Planning Board ("Board") prepares an annual State Plan that inventories all health care facilities. The State Plan summarizes the number of beds and types of services offered in the State and projects the number of additional beds needed or excess beds in the State. (Tr. 427–28).

128. The procedure for obtaining a "substantive" CON in Illinois involves several steps. (Tr. 437–38).

129. An unsuccessful applicant can request an administrative hearing and, if the application is denied after this hearing, can seek judicial review in the Illinois Circuit Court. (Tr. 437–38).

130. If the CON is granted, any affected party can seek reconsideration from the Board and may have a right of appeal to the courts. (Tr. 438–39, 452).

131. Beginning in 1983, and continuing into 1984, the three Rockford hospitals tried "maintaining a united front" during contract negotiations with Blue Cross and Blue Shield of Illinois ("Chicago Blue Cross"). (GX 17 at R3430).

132. Essentially, this united front consisted of the fact that "the three Rockford Hospitals had agreed not to sign a standard Blue Cross contract due to the resulting reduction in payments" that each hospital would receive under the proposed standard contract. (GX 19 at R3356).

133. Ultimately "the united effort of the three Rockford Hospitals opposing the Chicago Blue Cross standard contract was partially successful" because "[a]fter a series of meetings with Blue Cross, St. Anthony Hospital signed a modified contract and SwedishAmerican eventually followed suit." In addition, "Rockford Memorial Hospital was able to achieve a modified Chicago Blue Cross agreement for a period of eighteen months." (GX 23 at R804–05).

134. The united front taken by the three Rockford Hospitals had its genesis in events that occurred after a local Blue Cross plan, based in Rockford, was merged into the Chicago Blue Cross plan in 1982. (DX 64 at 1). Before that merger, each of the three Rockford hospitals had a contract with the Rockford Blue Cross plan that paid the full charges that were billed by each hospital. (Tr. 537, 1475; GX 34 at 2).

135. After merging with the Rockford Blue Cross plan, Chicago Blue Cross wanted to negotiate a new contract with each of the three Rockford hospitals pursuant to which Chicago Blue Cross would pay each hospital less than its full charges, as billed. (Tr. 537, 1476).

136. Chicago Blue Cross wanted to negotiate these new contracts with the three Rockford hospitals because they were the only hospitals in the State of Illinois that were being paid their full charges, as billed; Chicago Blue Cross was paying all other hospitals in the state on the lower, "cost plus 5%," basis. (GX 33 at 1).

137. The existence of the more favorable payment terms to the three Rockford hospitals had put Blue Cross' "contracts with the other hospitals [in the state] in

major jeopardy," making it "increasingly urgent" for Chicago Blue Cross to conform its contract with each of the three Rockford hospitals with the contracts it had elsewhere in the state. (DX 64 at 1).

138. "The representatives of Chicago Blue Cross [were] staunch in their position that they should have their standard hospital contract (cost plus 5 percent) accepted by each of the three Rockford hospitals." (GX 34 at 2).

139. Following several consultations with each of the three Rockford hospitals, representatives of Chicago Blue Cross "agreed to joint meetings [with the three Rockford hospitals] in the hope that this would bring about a level of understanding on conceptual issues which would establish a framework within which [Chicago Blue Cross] could successfully conclude individual hospital negotiations" concerning the new contractual arrangements that it was proposing for each of the Rockford hospitals. (GX 32 at 2).

140. After holding those meetings with the three Rockford hospitals, Chicago Blue Cross sent a letter to each hospital, dated October 21, 1983. The letter from Chicago Blue Cross informed each of the three Rockford hospitals that Chicago Blue Cross desired to pursue individual hospital negotiations and that further collective conferences were no longer in the best interests of the parties. (GX 32, 75, 92).

141. In early November, 1983, St. Anthony became aware that SwedishAmerican had decided to sign a contract with Chicago Blue Cross. (GX 34 at 2).

142. In response to this development, Mr. Marvin Webber, the president of the advisory board of St. Anthony, wrote a letter dated November 17, 1983, to "Mr. David Knapp Chairman, SwedishAmerican Hospital." Mr. Webber emphasized that his letter concerned "an important matter which has serious long range financial implications affecting all three Rockford hospitals," and that "[t]his issue, which I believe needs immediate discussion by the representative members of the boards of all three hospitals, is the implications finan-cially of signing a contract by the hospitals with Chicago Blue Cross." Stating that he had recently learned of SwedishAmerican's decision to sign a contract with Chicago Blue Cross, Mr. Webber advised Mr. Knapp that "[t]his action is in direct opposition to the desires of both Rockford Memorial and St. Anthony Hospitals." In his letter Mr. Webber also reminded Mr. Knapp that "all three [Rockford] hospitals have agreed to collectively refuse to sign a contract" with Chicago Blue Cross. Mr. Webber went on to advise:

> If all three [Rockford] hospitals continue to stand firm in not signing a contract, we would continue to function in a similar environment. However, if one hospital in Rockford agrees to sign a contract, it creates a situation where it will force the remaining two hospitals to also sign a similar contract.

Mr. Webber concluded his letter to the chairman of SwedishAmerican by calling for a meeting to discuss the entire matter and requested that the meeting occur before SwedishAmerican signed a contract with Blue Cross. Copies of Mr. Webber's letter to Mr. Knapp were sent to the president and to the chairman of the board of directors of Rockford Memorial. (GX 33).

143. SwedishAmerican agreed not to make a commitment to Chicago Blue Cross until after the meeting was held that Mr. Webber had requested in his letter of November 17, 1983. (GX 42 at R758).

144. The meeting of representatives of the three Rockford hospitals that Mr. Webber had requested was held on November 29, 1983, and it was attended by representatives of all three Rockford hospitals, including the president of each hospital.

145. About two weeks later, at the December 14, 1983, meeting of the joint conference committee of Rockford Memorial's board of trustees, Mr. Maysent reported that "[o]riginally all three Rockford hospitals agreed not to sign the contract with [Chicago] Blue Cross," but that Swedish-American had advised of their intention to sign a contract with Chicago Blue Cross. After indicating that negotiations were still in progress, Mr. Maysent complained that "[i]t is very difficult to negotiate this issue

when one hospital announced its intentions to break the original agreement not to sign the Blue Cross Contract." (GX 18 at R3436).

146. The chairmen of the boards of directors, as well as the presidents, of all three Rockford hospitals took part in meetings and discussions concerning the "united effort of the three Rockford hospitals opposing the Chicago Blue Cross standard contract." (GX 23 at R804; GX 35).

147. At Rockford Memorial, the efforts of the three Rockford hospitals to maintain a united front against Chicago Blue Cross were reported to the board of trustees or to a joint conference committee of the board on at least six occasions between September 1983 and September 1984. (GX 17 at R3430; GX 42 at R758; GX 18 at R3436; GX 19 at R3356; GX 22 at R801; GX 23 at R804–05).

148. The last report on the united effort of the Rockford hospitals against Chicago Blue Cross was given to the Rockford Memorial Board of trustees on September 19, 1984, at which the board was provided with a detailed summary of events. (GX 23 at R804–05). In this report a reference was also made to certain negotiations between the Illinois Hospital Association ("IHA") and Chicago Blue Cross. These were not negotiations with respect to contract prices. (Tr. 1547). These negotiations concerned a contract that was silent with respect to the price, quality, and kinds of services covered by the contract, but they did address definitional terms and the structure of the contract. (Tr. 1037). Beyond that point, it would be up to Blue Cross and each individual hospital to arrive at a mutually agreeable contract. (Tr. 1038).

149. A "modified contract" that St. Anthony signed with Chicago Blue Cross is also referenced in the September 19, 1984, minutes of the Rockford Memorial board of trustees meeting. This "modified contract" was more closely aligned with the "full charges" payment terms of the contract that St. Anthony previously had with the Rockford Blue Cross plan. (Tr. 539; GX 23 at R804–05).

150. Among those present at the Rockford Memorial board of trustees meeting on September 19, 1984, when the last report was given about the united efforts of the three Rockford hospitals to oppose the Chicago Blue Cross standard contract, were: R. Robert Funderburg, H.W. Maysent, John B. Whitehead, Jared W. Sparks and William O. Nelson; among the Rockford Memorial board members absent from this meeting was C. Gordon Smith. (GX 23 at R804). These six Rockford Memorial board members are all designated to be members of the board of directors of the new corporation that would control Rockford Memorial and SwedishAmerican after the merger; they comprise one-half of the membership of the new corporation's 12–member board; and Messrs. Nelson and Sparks have been selected as, respectively, chairman and chairman-elect of the board of the new corporation. (Tr. 1911–12).

151. Mr. Nelson approved of the united efforts of the three Rockford hospitals in opposing a standard Chicago Blue Cross contract. (Tr. 1909).

152. At the September 19, 1984, meeting of the Rockford Memorial board of trustees, the united efforts of the three Rockford hospitals to oppose the Chicago Blue Cross standard contract were discussed, and no board member objected to those efforts having been undertaken. (Tr. 1908–09).

153. As far as the management of Rockford Memorial was concerned, its contract dispute with Chicago Blue Cross in the 1983–84 period was a straightforward dispute over money—"[Rockford Memorial] was trying to negotiate a contract which would be more favorable to the hospital." (Tr. 1909). Similarly, when they took collective actions against Chicago Blue Cross, the three Rockford hospitals "were attempting collectively to try to see what we could do, if anything, to have a more favorable contract than the existing standard Blue Cross contract." (Tr. 1548).

154. In dealing with Chicago Blue Cross, Rockford Memorial and its board of trustees "didn't have a long discussion of what would [Rockford Memorial's actions] do to the Blue Cross subscribers." (Tr.

1914). "I don't think [the board] necessarily paid too much attention to the Blue Cross, other than that we were in a situation of trying to negotiate the best contract for the hospital." (Tr. 1913).